# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Retail Energy Supply Association,     :
                Petitioner    :
                              :
         v.               :    No. 230 C.D. 2017
                              :    Argued:  December 6, 2017
Pennsylvania Public Utility       :
Commission,                        :
                Respondent    :

BEFORE:     HONORABLE MARY HANNAH LEAVITT, President Judge
                 HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE ROBERT SIMPSON, Judge
                 HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE MICHAEL H. WOJCIK, Judge

OPINION BY
JUDGE COHN JUBELIRER                FILED:  May 2, 2018

Deregulation of the electricity market under the Electricity Generation Customer Choice and Competition Act[1] (Choice Act), has permitted all residential customers of electric distribution companies[2] (EDC) in the Commonwealth to

---

[1] 66 Pa. C.S. §§ 2801-2815.  The Choice Act deregulated the generation of electricity. Section 2806(a) of the Choice Act, 66 Pa. C.S. § 2806(a).  The Choice Act provides that "all customers of electric distribution companies in this Commonwealth shall have the opportunity to purchase electricity from their choice of electric generation suppliers.  The ultimate choice of the electric generation supplier is to rest with the consumer." *Id.*

[2] Section 2803 of the Choice Act defines "electric distribution company" as follows:

The public utility providing facilities for the jurisdictional transmission and distribution of electricity to retail customers, except building or facility owners/operators that manage the internal distribution system serving such building

choose their electricity generation supplier[3] (EGS) and have that electricity distributed to them by the EDC in their area. Residential customers can contract with any licensed EGS, which may charge less than, or more than, the price-to-compare (PTC) or default price, which is the price the EDC charges residential customers, who choose not to shop, in order to supply them with electricity. However, for low-income customers, the Choice Act mandates that they have access to affordable electricity, including through low-income assistance programs. One such program is the Customer Assistance Program (CAP). The CAP allows low-income customers to pay a percentage of their bills, with the unpaid portion subsidized through a universal service charge that non-CAP customers pay. Over time, it became apparent that approximately half of the CAP customers of PPL Electric Utilities Corporation (PPL), who, like non-CAP customers, have had the

---

or facility and that supply electric power and other related electric power services to occupants of the building or facility.

66 Pa. C.S. § 2803.

[3] Section 2803 of the Choice Act defines "electric generation supplier" as follows:

A person or corporation, including municipal corporations which choose to provide service outside their municipal limits except to the extent provided prior to the effective date of this chapter, brokers and marketers, aggregators or any other entities, that sells to end-use customers electricity or related services utilizing the jurisdictional transmission or distribution facilities of an electric distribution company or that purchases, brokers, arranges or markets electricity or related services for sale to end-use customers utilizing the jurisdictional transmission and distribution facilities of an electric distribution company. The term excludes building or facility owner/operators that manage the internal distribution system serving such building or facility and that supply electric power and other related power services to occupants of the building or facility. The term excludes electric cooperative corporations except as provided in 15 Pa.C.S. Ch. 74 (relating to generation choice for customers of electric cooperatives).

*Id*.

unrestricted right to shop for their electricity supplier, were paying more than the PTC. As a result, non-CAP customers were paying more to subsidize the cost of supplying CAP customers with electricity, while CAP customers, whose subsidies are limited, were more quickly exhausting their subsidies. Those CAP customers who exhausted their subsidies were removed from the CAP and had to pay the entirety of their electricity bill. In order to address these issues, PPL, along with several other interested stakeholders, Pennsylvania Public Utility Commission's (PUC) Bureau of Investigation and Enforcement (I&E), the Office of Consumer Advocate (OCA), and the Coalition for Affordable Utility Services and Energy Efficiency in Pennsylvania (CAUSE-PA), ultimately proposed that the right of CAP customers to shop for their EGS be restricted, limiting CAP customers to EGSs participating in the CAP-Standard Offer Program (CAP-SOP). The CAP-SOP requires an EGS participating in the CAP-SOP to agree to serve customers at a 7-percent discount off the PTC at the time of enrollment, with the price remaining fixed for 12 months. The CAP-SOP prohibits an EGS from charging an early cancellation or termination fee. Following an evidentiary hearing, PUC adopted PPL's proposed CAP-SOP in an October 27, 2016 Opinion and Order. Retail Energy Supply Association[4] (RESA) petitions for review of PUC's October 27, 2016 Opinion and Order, as well as PUC's January 26, 2017 Opinion and Order denying RESA's petition for rescission/amendment.[5]

---

[4] RESA avers that it was founded in 1990 and "is a broad and diverse group of more than twenty retail energy suppliers dedicated to promoting efficient, sustainable and customer-orientated competitive retail energy markets." (RESA Br. at 6 n.1.)

[5] RESA petitioned for reconsideration; however, its petition was not timely filed. Nevertheless, PUC exercised its discretion pursuant to Section 1.2 of its regulations, 52 Pa. Code § 1.2, so as to consider RESA's petition for reconsideration as one for rescission or amendment, which, PUC noted, may be filed at any time. (PUC Opinion (Op.) and Order at 2 n.1, Jan. 26,

3

At the center of this appeal is whether PUC has the authority to adopt PPL's CAP-SOP and, if so, whether substantial evidence supports PUC's reasons for adopting it. In a previous case, *Coalition for Affordable Utility Services and Energy Efficiency in Pennsylvania v. Pennsylvania Public Utility Commission (CAUSE-PA)*, 120 A.3d 1087, 1103, 1107 (Pa. Cmwlth. 2015) (*en banc*), *allocatur denied*, 136 A.3d 982 (Pa. 2016), we held that PUC may "'bend' competition under the Choice Act" so as "to give way to other important concerns" such as "ensuring that universal service plans are adequately funded and cost-effective." In this case, we continue our examination of the extent to which PUC can "bend competition" by approving PPL's CAP-SOP.

## I. Background

The Choice Act requires, "at a minimum," that the Commonwealth "continue the protections, policies and services that now assist customers who are low-income to afford electric service." Section 2802(10) of the Choice Act, 66 Pa. C.S. § 2802(10). In furtherance of this policy, the Choice Act requires an EDC, such as PPL, to submit triennially for PUC approval a Universal Service and Energy Conservation Plan (USECP). Section 2804(15) of the Choice Act, 66 Pa. C.S. § 2804(15); 52 Pa. Code § 54.74(a)(1). "Universal service and energy conservation" (USEC) is defined as the "[p]olicies, protections and services that help low-income customers to maintain electric service." Section 2803 of the Choice Act, 66 Pa. C.S. § 2803. The term USEC includes CAPs, *id.*, which are programs designed to help "low-income, payment troubled customers." 52 Pa. Code § 69.264. Specifically, a CAP is an "alternative collection method" whereby "CAP participants agree to make

<hr>

2017.) However, in PUC's order denying relief, it inadvertently referred to the petition as one for reconsideration. (*Id.* at 32.)

4

regular monthly payments that may be for an amount that is less than the current bill in exchange for continued provision of electric utility services." 52 Pa. Code § 54.72.

Under PPL's current CAP program, known as the "OnTrack Program," CAP residential customers can be enrolled in one of three payment plans. The majority of CAP customers are enrolled in the percent of bill plan, which uses a mathematical formula to determine the amount the CAP customer is expected to pay each month for the next 18 months regardless of the CAP customer's usage or the cost of energy (CAP bill). The difference between the CAP customer's CAP bill and the total bill that a non-CAP customer would have been required to pay based on usage and price per kilowatt-hour (kWh) is known as a CAP credit or CAP shortfall. Each CAP customer is allowed only a certain amount of credit over an 18-month period: for electric heat customers, the maximum CAP credit is $3,328, and for non-electric customers, the maximum CAP credit is $1,310. "CAP credits are reduced each month on a dollar for dollar basis." (Reproduced Record (R.R.) at 231a.) Thus, if a customer's bill without the CAP is $250, but his CAP bill is $200, the CAP customer is responsible for paying only $200. *Id.* The $50 difference or shortfall is deducted from the CAP customer's available maximum CAP credits. If a CAP customer exhausts all of his CAP credits before the expiration of the 18-month period, he no longer receives a CAP bill based on the ability to pay; rather he must pay his entire bill, regardless of its affordability. Non-CAP residential customers pay for the CAP credits through the Universal Service Rider, which PPL builds into its rates.

Since 2010, both CAP customers, and non-CAP customers, have had the ability to shop for an EGS. CAP customers were "allowed to enter into any contract with any licensed EGS and pay any price for service regardless of whether that price

5

[wa]s higher or lower than PPL's price to compare" or default service price, that is, the price a CAP customer would have paid had he not shopped.[6] (*Id.* at 234a.)

In 2014, following PPL's filing of its 2014-2016 USECP, PUC concluded that CAP shopping was beyond the scope of the USECP proceeding and directed PPL to address CAP shopping as part of its next Default Service Program and Procurement Plan (DSP).[7] PPL petitioned PUC for the approval of its fourth DSP (DSP IV Program) from June 1, 2017, through May 31, 2021. PPL noted in its DSP Petition (Petition) that at its most recent base rate proceeding, PUC had approved a settlement agreement under which "the parties agreed to hold a collaborative on CAP shopping." (*Id.* at 102a, 120a.) Prior to the filing of the Petition, several collaborative meetings were held with interested stakeholders during which PPL provided data concerning its CAP customers who shopped for an EGS.

Specifically, PPL's data showed as follows.[8] In 2013 and 2014, and up to October 31, 2015, the average monthly percentage of CAP customers who were shopping for an EGS was 46 percent in 2013, 51 percent in 2014, and 52 percent for 10 months of 2015. During that same time period, the percentage of CAP customers

---

[6] Section 54.182 of Title 52 of the Pennsylvania Code defines "default service" as the "[e]lectric generation supply service provided pursuant to a default service program to a retail electric customer not receiving service from an EGS." 52 Pa. Code § 54.182. The default service rate is "[t]he rate billed to a default service customer resulting from compliance with a Commission-approved default service program," while the PTC is "[a] line item that appears on a retail customer's monthly bill for default service." *Id.*

[7] A default service provider is required to submit a DSP to PUC that "identifies a procurement plan, an implementation plan, a rate design to recover all reasonable costs and other elements identified in § 54.185 (relating to default service programs and periods of service)." 52 Pa. Code § 54.182.

[8] PPL witness Michael S. Wukitsch, a Customer Relations Specialist in PPL's Customer Service Department, testified before PUC regarding PPL's statistics and data for CAP shopping. His direct testimony, which was submitted through written statements, is found at pages 114a-127a of the Reproduced Record.

6

who selected an EGS with a price **above** the PTC was 67 percent, 50 percent, and 46 percent respectively. Over a 34-month period, January 2013 through October 2015, an average of 49 percent of CAP customers were shopping, and 55 percent of those shopping were paying **above the PTC**. PPL conducted an analysis by month from January 1, 2012, through October 30, 2015, and discovered that on average 9,626 shopping CAP customers were paying above the PTC. During this time, the average PTC was $0.08475 per kWh. However, for those CAP customers paying above the PTC, the average price was $0.11048. Considering that the average CAP customer who paid above the PTC used 1,197 kWh of electricity, PPL calculated that had these CAP customers not shopped and paid the PTC, they would have paid $31 less a month. This meant that each month, on average, CAP customers who paid above the PTC paid $298,406 (9,626 x $31) more than had they paid the PTC. Extrapolated over 12 months, the estimated impact on CAP customers paying above the PTC was $3,580,872.[9]

PPL also analyzed CAP customers who paid at or below the PTC from January 1, 2012, through October 30, 2015. PPL discovered that on average 7,750 CAP customers were paying at or below the PTC. During this time, the average PTC was $0.08475, while these CAP customers paid an average of $0.07772. Considering that the average CAP customer who paid at or below the PTC used 1,294 kWh, PPL calculated that these customers saved $9 a month by shopping instead of paying the PTC. This meant that each month, on average, CAP customers

---

[9] During the proceeding before PUC, PPL provided additional data for December 2015 through February 2016. This data showed that during this time period, 88 percent to 93 percent of CAP customers were paying above the PTC. These percentages were attributed to the fact that on December 1, 2015, PPL's PTC dropped $0.01575 per kWh.

7

who paid at or below the PTC saved $69,750, which, when extrapolated over 12 months, resulted in estimated savings of $837,000.

Considering these two groups together, the net financial impact was $228,656 or, extrapolated over 12 months, $2,743,872. Based on this data, PPL concluded that two harms were occurring as a result of CAP shopping: first, CAP customers who paid above the PTC were exceeding their CAP credits at a faster pace, which put them at risk of being removed from the CAP,[10] and, second, non-CAP customers, who subsidize the CAP customers, were bearing the increased CAP costs.

Based on the ongoing harms, PPL believed that some limits on CAP shopping should be developed.[11] However, while PPL considered various CAP shopping proposals that had been offered during the collaborative, PPL initially recommended, for a variety of reasons, that PUC "promptly initiate a statewide collaborative open to all interested stakeholders and/or initiate a new rulemaking proceeding to address these CAP shopping issues on a uniform, statewide basis." (*Id.* at 112a.) As a temporary measure, PPL proposed that CAP customers be encouraged to participate in PPL's Standard Offer Referral Program (the traditional SOP). The traditional SOP is available to all residential customers, including those enrolled in PPL's CAP.[12] The traditional SOP allows customers to receive electricity

___

[10] Between January 2012 and October 2015, an average of two percent of CAP customers, both shopping and non-shopping, were removed from PPL's CAP for exceeding their CAP credits.

[11] James M. Rouland, PPL's Supervisor of Energy Procurement, Settlement and Scheduling, testified via written statements about limits that might be placed on CAP shopping. His direct testimony is found at pages 105a-113a of the Reproduced Record.

[12] When a customer calls PPL, for example, when initiating electric service, the PPL call center representative will ask the customer if he is interested in hearing about opportunities for potential savings on his electric generation bill. If so, the customer is transferred to a PPL Solutions representative who will offer the customer an opportunity to enroll in an EGS product that provides a customer with a 12-month fixed price at a 7 percent discount off the then-current PTC. If the customer chooses to enroll, the customer can choose to receive service from a

8

from an EGS at a seven percent discount from the then-effective PTC for one year and does not permit an EGS to charge a termination or cancellation fee. Until a uniform, statewide solution could be developed, PPL proposed that any customer who either inquired about the CAP or other low-income programs or is enrolled in the CAP be advised about the availability of the traditional SOP, including its terms and conditions.

Other parties interested in PPL's DSP IV Program submitted their own proposals on how to mitigate the harm resulting from CAP shopping. OCA proposed, *inter alia*, that PPL implement a program rule enforced by PUC whereby EGSs who seek to serve CAP customers, if at all, must do so at a rate equal to or below the PTC or, in the alternative, since PPL bills and collects for EGSs, PPL could notify an EGS and the customer when a price is charged that is higher than the PTC.[13] CAUSE-PA proposed, *inter alia*, that PPL create structures prohibiting CAP customers from contracting with EGSs for a price that would be higher than the PTC at any time or for early cancellation or termination fees.[14] RESA submitted rebuttal testimony opposing the proposals of both OCA and CAUSE-PA. RESA opposed restrictions on the type of offers an EGS might provide to CAP customers simply because of their enrollment in the CAP. RESA asserted that it was inappropriate to

---

particular EGS or, if the customer does not choose a specific EGS, one is randomly assigned to the customer. An EGS pays a fixed fee of $28 per referred customer. A customer enrolled in the SOP with an EGS may terminate his contract early – for example, when the PTC drops below what was a seven percent discounted rate – and re-enroll in the SOP with a new rate, now at seven percent below the new PTC.

[13] OCA's proposal was offered through the testimony of Barbara R. Alexander, a Consumer Affairs Consultant for OCA, whose direct testimony, via written statements, is found at pages 181a-196a of the Reproduced Record.

[14] CAUSE-PA's proposal was offered through the testimony of Harry Geller, an attorney who maintains an office at the Pennsylvania Utility Law Project, whose direct testimony, via written statements, is found at pages 218a-256a of the Reproduced Record.

rely solely on the PTC in determining what constitutes an appropriate price because a CAP customer might choose a certain EGS product because of price certainty or because of "value-added products."[15] (*Id.* at 323a.)

In rebuttal testimony, PPL produced data showing that since the inception of the SOP, on January 1, 2010, to November 30, 2015, "the PTC has typically been higher than the SOP 7% discount rate, and the PTC has decreased by more than 7% from the prior PTC on only four occasions."[16] (*Id.* at 314a.)

In rebuttal testimony, CAUSE-PA expressed concerns with PPL's proposal to encourage CAP customers to use the traditional SOP, in that, while a CAP customer would receive an initial seven-percent discount off the PTC at the time of enrollment with the price fixed for 12 months, there was no guarantee that this price would stay below the PTC for the duration of the contract.[17] This is because the PTC can change on June 1 and December 1. Thus, CAP customers needed to be insulated from the effects of fluctuations in the PTC.

In sur-rebuttal testimony, CAUSE-PA proposed that PPL use a modified version of the traditional SOP, the CAP-SOP, as the only vehicle that a CAP customer could use to select an EGS.[18] An EGS participating in the CAP-SOP would have to agree to serve CAP customers at a seven-percent discount off the PTC at the time of enrollment and, if the PTC dropped more than seven percent at any time

---

[15] RESA never explained what constitutes value-added products, but on appeal describes such products as including "loyalty discounts, reward points and gift cards." (RESA Reply Brief (Br.) at 15.)

[16] PPL provided rebuttal testimony from Wukitsch, whose rebuttal testimony, via written statements, is found at pages 308a-315a of the Reproduced Record.

[17] CAUSE-PA provided rebuttal testimony from Geller, whose rebuttal testimony, via written statements, is found at pages 326a-335a of the Reproduced Record.

[18] CAUSE-PA's proposal was offered through the sur-rebuttal testimony of Geller, whose sur-rebuttal testimony, via written statements, is found at pages 373a-394a of the Reproduced Record.

during the CAP customer's enrollment, to either re-enroll the CAP customer as a new CAP-SOP enrollee with a seven-percent discount off the then-applicable PTC or return the CAP customer to default service. The CAP customer would be able to leave the CAP-SOP contract at any time without a termination or cancellation fee. At the end of the 12-month CAP-SOP contract, an EGS would be required to either re-enroll the CAP customer in a new CAP-SOP contract that is a seven-percent discount off the then-applicable PTC or, if the EGS decides to stop serving CAP customers, the CAP customer would be returned to default service. A CAP customer would not be permitted to enroll in an offer that does not comply with the CAP-SOP.

RESA opposed CAUSE-PA's proposed CAP-SOP.[19] RESA argued that if an EGS is required by the CAP-SOP "to offer a discount to a future unknown price," because every six months the PTC can change, an added risk of providing service to CAP-SOP customers exists.[20] (*Id.* at 409a.) RESA noted that the traditional SOP for non-CAP customers has a fixed 12-month price, but that price must be a seven-percent discount off the PTC at the time of enrollment, and not for the entire length of the contract; an EGS is not obligated to drop the price if the PTC drops. (*Id.* at 408a.) Given this, RESA believed that "few, if any, EGSs, will choose to participate in the [CAP-]SOP." (*Id.* at 409a.) In addition, CAUSE-PA's CAP-SOP would effectively eliminate a CAP customer's ability to shop for competitive electricity

---

[19] RESA's opposition to CAUSE-PA's CAP-SOP was offered through the rejoinder testimony of Matthew White, General Counsel of Legislative and Regulatory Affairs for Interstate Gas Supply, Inc., whose rejoinder testimony, via written statements, is found at pages 406a-410a of the Reproduced Record.

[20] In prior rebuttal testimony, White stated that there were any number of reasons why a CAP customer might elect one EGS over another, such as price certainty or other value-added products and services, and, thus, using only the PTC for what constitutes an appropriate price was inappropriate. (R.R. at 323a.)

11

supply because CAP customers would be limited "to electing just one product available in the market." (*Id.* at 410a.) However, since no EGS would be willing to serve CAP customers on that product, CAUSE-PA's CAP-SOP "would have the practical effect of eliminating shopping for all CAP customers." (*Id.*)

PPL found CAUSE-PA's proposal to be a "significant improvement" over its original proposal.[21] (*Id.* at 400a.) PPL, however, suggested some modifications to CAUSE-PA's proposal. CAUSE-PA's proposal, PPL noted, essentially required an EGS to guarantee that a CAP customer would receive the seven-percent discount off the PTC for the entire 12-month contract. This would be problematic because the PTC changes every six months, and, thus, an EGS would have "to agree to an entirely unknown rate for a 12-month period." (*Id.* at 401a.) Thus, PPL proposed that an EGS participating in the CAP-SOP agree to serve customers at a seven-percent discount off the PTC at the time of enrollment, with the price remaining fixed for 12 months. Following PPL's modifications to the CAP-SOP, PPL offered its CAP-SOP as the Joint Litigation Position of CAUSE-PA, OCA, and I&E. Thus, these parties abandoned their original CAP shopping proposals. PPL's proposed CAP-SOP was, in pertinent part, as follows:

> 4. The Joining Parties agree that, until a uniform, statewide solution to CAP shopping can be developed, PPL Electric shall implement a CAP Standard Offer Program ("CAP–SOP"), effective June 1, 2017, with the following features designed to help mitigate the impacts that CAP shopping can have on CAP credits, risk of early removal from the OnTrack program, and the CAP costs that are paid for by other Residential customers through the Universal Service Rider:
>
> (a) The CAP-SOP is the only vehicle that a CAP customer may use to shop and receive supply from an EGS.

---

[21] PPL's proposal was offered through the rejoinder testimony of Rouland, whose rejoinder testimony, via written statements, is found at pages 397a-405a of the Reproduced Record.

(b) Any CAP customer shopping request that does not get processed through the CAP-SOP will be denied.

(c) EGSs participating in the CAP-SOP must agree to serve customers at a 7% discount off the PTC at the time of enrollment. This price shall remain fixed for the 12-month CAP-SOP contract unless terminated earlier by the customer.

(d) CAP customers may terminate the CAP-SOP contract at any time and without any termination or cancellation fees or other penalties.

(e) A CAP customer who terminates a CAP-SOP contract or whose CAP-SOP contract reaches the end of its term can re-enroll in the CAP-SOP.

(f) At the conclusion of a 12-month CAP-SOP contract, the CAP customer will be returned to the CAP-SOP pool and be re-enrolled in a new CAP-SOP contract, unless the CAP customer requests to be returned to default service or is no longer a CAP customer.

(g) EGSs must enroll separate from the standard SOP to be a participating supplier in the CAP-SOP. EGSs would be free to voluntarily elect to participate in none, one or the other, or both the traditional SOP and the proposed CAP-SOP. Enrollment will be for a three-month period, and shall conform to the enrollment process for the standard SOP. EGS may opt in to participate in the CAP-SOP on a quarterly basis, and are free to leave the CAP-SOP on a quarterly basis.

5. For the purpose of transitioning CAP customers who are shopping as of the CAP-SOP June 1, 2017 effective date:

(a) All CAP customer shopping fixed-term contracts in effect as of the effective date of the CAP-SOP will remain in place until the contract term expires and/or is terminated.

(b) Once the existing CAP customer shopping contract expires or is terminated, the CAP customer will have the option to enroll in the CAP-SOP or return to default service, but in any event will only be permitted to shop through the CAP-SOP.

(c) PPL Electric will revise its CAP recertification scripts/process so that all existing CAP shopping customers receiving generation supply on a month-to-month basis after June 1, 2017 will be required at the time of CAP recertification to enroll in the CAP-SOP or return to default service, but in any event will only be permitted to shop through the CAP-SOP.

(R.R. at 418a-20a.)

Following the close of all evidence,[22] the administrative law judge (ALJ) issued her Initial Decision, which, *inter alia*, recommended adoption of PPL's CAP-SOP with one modification. (PUC Opinion (Op.) and Order at 4, Oct. 27, 2016.)

RESA filed Exceptions to the ALJ's Initial Decision, arguing that the proponents of restricting CAP shopping had not satisfied their burden of proof, the ALJ failed to properly analyze the alternatives to restricting the right to shop presented in the record, and the ALJ erroneously relied on the data that was presented as sufficient to justify restricting shopping. RESA also argued that even if the proponents had met their burden of proof, PPL's CAP-SOP would not succeed because no EGSs would be willing to participate.

PUC, in its Opinion and Order, denied RESA's Exceptions to PPL's CAP-SOP.[23] (*Id.* at 67.) PUC concluded that the parties supporting PPL's CAP-SOP met their burden of proof. (*Id.* at 40, 53.) PUC wrote, in pertinent part, as follows:

> We find that the Joint Parties have met their burden of proof that the CAP-SOP proposal has merit and that [PUC] should adopt this proposal on an interim basis. We do not come to this conclusion lightly, as [PUC] has been steadfast in its support of the competitive electric generation market in Pennsylvania. However, based upon the substantial and **unrefuted** evidence presented by PPL in this

---

[22] All parties waived cross-examination of the witnesses. (PUC Op. and Order at 4, Oct. 27, 2016.)

[23] PUC declined to adopt the ALJ's modification, which is not at issue on appeal.

14

proceeding, it is incumbent upon [PUC] to address this matter in a reasonable and prudent fashion to balance the competing objectives within the [Choice] Act. It is vitally important that the existing CAP programs be administered in a financially responsible fashion consistent with our obligations under the [Choice] Act to foster competitive electric markets.

We conclude that our decision to approve the CAP-SOP is consistent with the Commonwealth Court's decision in *CAUSE-PA*. In that case, the Court held that we have the authority under Section 2804(9) of the [Choice] Act, for the purpose of ensuring that universal service plans are adequately funded and cost-effective, to approve CAP rules that would limit the terms of an offer from an EGS which a customer could accept and remain eligible for CAP benefits. *CAUSE-PA* [120 A.3d] at 1103. . . . In this case, the Parties presented substantial evidence in support of the proposed CAP-SOP, as well as evidence regarding why other alternatives would not be reasonable. The data provided by PPL in this proceeding demonstrated the economic harm experienced as the result of unrestricted CAP customer shopping decisions. The identified economic harm affects the ability of CAP customers to remain on CAP, as higher costs result in quicker erosion of the CAP customers' limited allocation of CAP credits and also affects non-CAP customers by increasing the subsidy they incur to support the universal service objectives within the [Choice] Act. We find that this unrefuted evidence is sufficient to permit [PUC] to impose CAP rules that may partially restrict or limit the ability of these customers to shop for electricity. In essence, we agree with the ALJ that mitigation is required to balance the interests between shopping and non-shopping customers. The CAP-SOP proposal of the Joint Parties, however, does not eliminate the ability of these customers to participate in the competitive marketplace. To the contrary, these customers will retain the ability to shop by participation in a form of the SOP, which provides a 7% discount off the PTC price in effect at the time of enrollment, which has been determined to be very successful in Pennsylvania since its inception.

Next, in consideration of RESA's position that there are several reasonable alternatives available in lieu of the proposed CAP-SOP option, we are in agreement with the ALJ that it is not feasible to require the Joint Parties to identify all possible alternatives. Rather, we find that several alternatives were, in fact, considered by the Parties, but that they ultimately determined that the Joint Litigation Position was the most reasonable such alternative. We conclude that none of the

15

alternatives suggested by RESA are acceptable alternatives. We further agree with the ALJ that RESA's recommendation to impose no restrictions on CAP shopping and to only encourage CAP customers to use the SOP if they do shop is simply insufficient. We conclude that this recommendation fails to protect CAP shoppers from the negative effects of paying more than the PTC and maximizes the burden on other Residential customers who fund the CAP program and, as such, is not a viable alternative.

. . . .

Therefore, we shall adopt the Joint Litigation Position[.]

(*Id.* at 53-56 (emphasis added) (footnote omitted).)

Next, PUC rejected RESA's argument that if PPL's CAP-SOP was adopted, EGSs would not participate. (*Id.* at 56, 66.) Considering that there is extensive EGS participation in the traditional SOP, PUC found RESA's argument to be "speculative" with "no basis whatsoever in the record." (*Id.* at 66.) PUC noted that PPL's CAP-SOP included a provision that the parties would have the ability to petition PUC to reopen the CAP-SOP in the event that there was no EGS participation and/or changes in retail market conditions that justified reopening the CAP-SOP. (*Id.*) Based on the foregoing, PUC adopted PPL's CAP-SOP. (*Id.* at 69-71.)

RESA then petitioned for rescission/amendment of PUC's October 27, 2016 Opinion and Order. RESA argued that PUC erred as a matter of law by not conducting a legal analysis of whether the alternatives to PPL's CAP-SOP, such as PPL's initial proposal to encourage its CAP customers to use PPL's traditional SOP, were reasonable. PPL's CAP-SOP, RESA argued, amounts to governmental slamming. PUC also erred in failing to properly weigh the evidence in the record showing that PPL's CAP-SOP would eliminate EGS participation in the CAP. Finally, RESA argued that if PUC decided to restrict shopping via PPL's CAP-SOP,

16

PUC should remand the matter to the ALJ so that a full record could be developed on other reasonable alternatives that may exist.

PUC declined to reconsider its October 27, 2016 Opinion and Order, concluding that RESA had not raised any new or novel arguments nor any that PUC had not already considered and rejected. (PUC Op. and Order at 17-19, Jan, 26, 2017.)

## II. Discussion[24]

### A. PUC's Authority to Restrict CAP Customers Right to Shop

#### 1. Contentions of the Parties

RESA argues that the clear and unambiguous language of the Choice Act requires that all customers of EDCs have the opportunity to purchase electricity from their choice of EGSs, but PPL's CAP-SOP does not allow CAP customers to have direct access to the competitive market or give them the opportunity to purchase electricity from their choice of EGSs. Indeed, PPL's CAP-SOP does not involve any shopping at all. Moreover, CAP customers cannot choose their EGS. Rather, CAP customers can only receive services from those EGSs who decide to participate in PPL's CAP-SOP. Even then, CAP customers do not select the EGS which serves them but are placed in a pool and assigned a participating EGS.

RESA adds that PUC exceeded its authority under the Choice Act by mandating the price terms for CAP customers. For an EGS, "the only avenue available . . . to serve PPL's CAP participants is to pay a $28 per customer referral fee and serve customers for 12 months at a mandatory 7% discount off the PTC at the time of enrollment, with no early cancellation fees." (RESA Brief (Br.) at 27.)

---

[24] We have reorganized RESA's issues on appeal for purposes of this opinion.

The Choice Act is clear, as is this Court's decision in *CAUSE-PA*, that PUC lacks the statutory authority to regulate EGS prices. While acknowledging that *CAUSE-PA* may permit a rate ceiling, RESA argues that PPL's CAP-SOP goes beyond a rate ceiling. A rate ceiling would allow an EGS some flexibility to offer products within a price range and provide "value added products and services." (*Id.* at 31.) Here, however, rather than being a rate ceiling, PPL's CAP-SOP, because it permits a participating EGS to offer only a single price at seven-percent off the PTC, is "the ceiling, walls and floor." (*Id.*)

RESA also argues that PUC's approval of PPL's CAP-SOP exceeds PUC's authority under the Choice Act in that the CAP-SOP forces CAP customers "who have affirmatively exercised their right to select an EGS to return to the EDC for default service." (*Id.* at 22-23.) Since CAP customers would be forced to return to default service without their consent, this constitutes "governmental slamming," which EGSs themselves are prohibited from doing.[25] (*Id.* at 23-24.).

PUC responds that under the Choice Act and this Court's decision in *CAUSE-PA*, PUC has the authority – indeed, the duty – to regulate EGSs serving CAP customers. This Court, in *CAUSE-PA*, PUC contends, said that PUC has the obligation to ensure that rates are just and reasonable, and that under certain circumstances, unbridled competition must give way to other important concerns, such as ensuring that the CAP is administered in a cost-effective manner for both CAP and non-CAP customers so that low-income customers may continue to have

---

[25] "'Slamming' is an unauthorized change to a customer's supply service." *Pa. Pub. Util. Comm'n, Bureau of Investigation & Enf't v. Energy Servs. Provider, Inc.*, Docket No. M-2013-2325122, 2014 WL 2644840, *2 n.3 (PUC). Section 57.177 of Title 52 of the Pennsylvania Code permits PUC, *inter alia*, to assess fines and initiate proceedings to revoke the license of an EGS that demonstrates a pattern of having changed a customer's EGS without his consent. 52 Pa. Code § 57.177.

access to electric service. Therefore, PUC concludes, it has the authority to bend competition by imposing price limits on EGSs serving CAP customers. The Intervenors[26] add that PPL's CAP-SOP does not set EGS prices because the participation of an EGS in the CAP-SOP is entirely voluntary. PPL separately argues that the CAP-SOP does not set the rate that EGSs must charge but merely sets a price ceiling.

While PUC does not specifically respond to RESA's contentions about governmental slamming, CAUSE-PA, OCA, and PPL argue that RESA mischaracterizes the record. PPL's CAP-SOP allows for CAP customers to finish their existing contracts with an EGS, and, once that contract has expired, the CAP customer can either return to default service, shop through the CAP-SOP, or contract with an EGS on mutually-agreed-to terms outside of the CAP-SOP, including with the EGS that had been previously supplying the customer.

In reply, on the issue of price, RESA argues that a rate ceiling contemplates a maximum that an EGS can charge, but what PUC permits here through PPL's CAP-SOP is the one and only price. While the Intervenors argue that an EGS's participation in the CAP-SOP is voluntary, this argument ignores the fact that the only options for an EGS that wishes to serve CAP customers is to offer this one and only price – a 7 percent discount from the PTC coupled with a $28 referral fee – or to not serve CAP customers at all.

On the issue of governmental slamming, RESA replies that when CAP "customers are presented with no opportunity to do anything other than what PUC has decided they may do and are forced to make a selection against their will and

---

[26] CAUSE-PA, OCA, and PPL, as Intervenors, have all submitted briefs in support of affirming PUC's Orders. We do not recount the arguments of the Intervenors where they are repetitive of those of PUC.

without their consent," this is slamming. (RESA Reply Br. at 16.) "[C]ontract expiration" is no defense to slamming. (*Id.*) PPL's CAP-SOP deprives CAP customers of the default position, pursuant to 52 Pa. Code § 54.10, to remain with their existing EGS, even after the contract expires, unless the customer elects a different option.

### 2. Scope and Standard of Review

On a petition to review a decision of PUC, our standard of review is limited to determining whether substantial evidence supports the necessary findings of fact, whether PUC erred as a matter of law, and whether constitutional rights were violated. *CAUSE-PA*, 120 A.3d at 1094. We defer to PUC's interpretation of the Public Utility Code[27] and its own regulations unless PUC's interpretations are clearly erroneous. *Id.* at 1095. We may not substitute our judgment for that of PUC "when substantial evidence supports the PUC's decision on a matter within the commission's expertise." *Id.* (internal quotation marks and citation omitted). "Judicial deference is even more necessary when the statutory scheme is technically complex." *Id.* (internal quotation marks and citation omitted). On issues of law, "our standard of review is *de novo* and our scope of review is plenary." *Id.*

### 3. Our Decision in *CAUSE-PA*

We begin with a review of our decision in *CAUSE-PA*. There, PECO Energy Company (PECO), an EDC, submitted for approval to PUC its CAP Shopping Plan. *Id.* at 1091. Under PECO's CAP Shopping Plan, an EGS that wished to participate in the CAP had to agree to charge a rate for electricity supply to CAP customers that

---

[27] The Choice Act is part of the Public Utility Code, 66 Pa. C.S. §§ 101-3316.

20

was at or below PECO's PTC but permitted an EGS to impose cancellation or termination fees. *Id.* OCA recommended that an EGS be prohibited from imposing cancellation or termination fees. *Id.* PUC concluded that it did not have the authority under the Choice Act to impose a limit on the shopping price for CAP customers at or below the PTC or to prohibit an EGS from charging early termination or switching fees. *Id.* at 1091-92. Petitioners appealed to this Court, arguing that PUC erred in its conclusion, and we agreed. We first looked to the language of the Choice Act, noting that "the rule requiring express legislative delegation is tempered by the recognition that an administrative agency is invested with the implied authority necessary to the effectuation of its express mandates." *Id.* at 1100 (citation omitted). We pointed out "that the overarching goal of the Choice Act is competition through deregulation of the energy supply industry, leading to reduced electricity costs for consumers[;]" however, this "scheme does not demand absolute and unbridled competition." *Id.* at 1101. Rather, at times, PUC may "'bend' competition under the Choice Act" so as "to give way to other important concerns" such as "ensuring that universal service plans are adequately funded and cost-effective." *Id.* at 1103.

Of particular significance, we saw in PUC's approval of PECO's SOP for non-CAP customers, although not at issue on appeal, an example of PUC bending competition under the Choice Act. *Id.* at 1090, 1093, 1103. PECO's SOP required an EGS to "agree to supply electricity to referred PECO customers at a fixed rate of at least 7% below PECO's PTC at the time of customer enrollment for a term of 12 months." *Id.* at 1090 (footnote omitted). A PECO customer in the SOP could cancel at any time without being charged a fee and could then select either an alternative EGS or return to PECO's default service PTC. *Id.* at 1090 & n.4, 1096. Because PUC rejected the price ceiling component of PECO's proposed CAP, PUC "directed

21

PECO to allow interested CAP customers to avail themselves of the [SOP]." *Id.* at 1093. Although PUC went "to great lengths" to explain the differences between the PECO SOP and the PECO CAP so as to justify its authority to approve the former but not the latter, we found the distinctions between the two programs to be "not material to the legal question of whether the PUC has statutory authority to implement, or approve, an EGS price ceiling under any circumstance." *Id.* at 1103. Indeed, if, as PUC argued, it "lack[ed] the authority to place a cap on the rate an EGS may charge a [non-CAP] customer, it seem[ed] to us that such lack of authority would extend to the **CAP as well as to the [SOP]**." *Id.* (emphasis added). Therefore, following the reasoning of both PUC and this Court in *PP & L Industrial Customer Alliance v. Pennsylvania Public Utility Commission*, 780 A.2d 773 (Pa. Cmwlth. 2001) (en banc), we concluded that PUC has the authority under the Choice Act to impose or approve "CAP rules that would limit the terms of any offer from an EGS that a customer could accept and remain eligible for CAP benefits[,]" including approving an EGS price ceiling and prohibiting early cancellation fees. *CAUSE-PA*, 120 A.3d at 1103-04. We went on to state the following:

> So long as it "provides substantial reasons why there is no reasonable alternative so competition needs to bend" to ensure adequately-funded, cost-effective, and affordable programs to assist customers who are of low-income to afford electric service . . . the PUC may impose CAP rules that would limit the terms of any offer from an EGS that a customer could accept and remain eligible for CAP benefits – *e.g.*, an EGS rate ceiling, a prohibition against early termination/cancellation fees, etc.

*Id*. at 1104 (quoting *PP & L*, 780 A.2d at 782).

Nevertheless, while we concluded that PUC has the authority to impose CAP rules, such as a price ceiling, there was substantial evidence in that record to support

PUC's conclusion that there was not a substantial reason "to justify limiting competition by imposing a price ceiling on EGSs." *Id.* at 1107.[28] Similarly, Petitioners did not persuade PUC that customer education programs, as a reasonable alternative to price regulation, were inadequate. *Id.* at 1107. However, we reached a different conclusion with respect to cancellation and termination fees. We held that PUC should have approved a rule prohibiting an EGS from charging a CAP customer cancellation and termination fees because it was undisputed that a prohibition on such fees would provide "an added layer of protection to CAP participants consistent with the affordability goals of the Choice Act[,]" and because PUC's decision to reject this prohibition out of concern for the impact it would have on competition and choice was not supported by substantial evidence. *Id.* at 1108.

### 4. PPL Has the Authority to Approve the CAP-SOP

While RESA argues that the Choice Act requires that CAP customers be given "[d]irect access to the competitive market" and, thus, "[t]he opportunity to purchase electricity from their choice of EGSs," (RESA Br. at 19-20), we held in *CAUSE-PA* that the Choice Act permits PUC to effectively limit competition and choice for low-income customers, provided there are no reasonable alternatives to restricting competition, so that other important policy concerns of the General Assembly, such as access, affordability, and cost-effectiveness, may be served. *CAUSE-PA*, 102 A.3d at 1104, 1106; *see* 66 Pa. C.S. § 2802(9) ("Electric service is essential to the health and well-being of residents, to public safety and to orderly economic development, and electric service should be available to all customers on reasonable terms and conditions"), (10) ("The Commonwealth must, at a minimum,

---

[28] We discuss this portion of our decision in *CAUSE-PA* in more detail in the section addressing RESA's substantial evidence challenge.

23

continue the protections, policies and services that now assist customers who are low-income to afford electric service"), (17) ("There are certain public purpose costs, including programs for low-income assistance . . . which have been implemented and supported by public utilities' bundled rates. The public purpose is to be promoted by continuing universal service and energy conservation policies, protections and services, and full recovery of such costs is to be permitted through a nonbypassable rate mechanism"); 66 Pa. C.S. § 2804(9) ("Programs under this paragraph shall be subject to the administrative oversight of the commission which will ensure that the programs are operated in a cost-effective manner"). As the General Assembly recognized in Section 2802 of the Choice Act, if CAP customers were given direct access to the competitive market, they would be priced out of the market because they cannot afford to pay the entirety of their bills. Further, PUC could find that PPL's prior CAP, which did allow for greater competition in that a CAP customer was permitted to enter into any contract with any licensed EGS and pay any price for service regardless of whether the price was higher or lower than PPL's PTC, was causing harm to both CAP and non-CAP customers in terms of access, affordability, and cost-effectiveness. Substantial evidence in the record supports PUC's finding, as we discuss more fully below in the section addressing RESA's substantial evidence challenge, that PPL's prior CAP, without any shopping restrictions, resulted in about half of shopping CAP customers paying above the PTC who then exhausted their CAP credits more rapidly, while non-CAP customers had to pay higher rates since they subsidize the cost of electricity for CAP customers. PUC's approval of PPL's CAP-SOP is designed to alleviate harms to access, affordability, and cost-effectiveness resulting from unrestricted CAP shopping. We recognize that there is a "tension" between competing policy concerns promoting

competition and choice, and protecting access, affordability, and cost-effectiveness; however, PUC's approval of the CAP-SOP seeks to strike a balance between these concerns under the authority the General Assembly gave it through the Choice Act.[29] *CAUSE-PA*, 120 A.3d at 1101.

PUC's approval of the price term of PPL's CAP-SOP at a 7 percent discount off the PTC at the time of enrollment for a fixed period of 12 months serves these other important policy concerns of the General Assembly, and the price term does not exceed PUC's authority under the Choice Act. It is evident that PPL's CAP-SOP is modeled after PPL's traditional SOP. There is not a marked difference between the two programs. The traditional SOP and CAP-SOP share the following features: both offer a fixed 12-month price based on a 7 percent discount off the PTC in effect at the time the customer enrolls; both the traditional SOP and CAP-SOP prohibit an EGS from charging a cancellation or early termination fee; both the traditional SOP and CAP-SOP permit the customer to re-enroll in the program, including when the PTC drops below the discounted rate or when the customer cancels his contract and seeks to re-enroll at a new rate discounted 7 percent below the then new PTC; and both allow an EGS to participate on a quarterly basis and to leave on a quarterly basis. Moreover, the CAP-SOP here, modeled after PPL's traditional SOP, shares many of the same features of the SOP in *CAUSE-PA*, which

---

[29] RESA's advocacy in favor of unregulated competition so that CAP customers can choose an EGS for reasons "[b]eyond lower pricing" arguably undercuts the Choice Act's concern for accessible, affordable, and cost-effective electrical service for all Pennsylvanians. (RESA Reply Br. at 15.) RESA would have CAP customers "leverage the power of the competitive market" so that they might obtain "loyalty discounts, reward points and gift cards offered through some EGS programs." (*Id*.) However, that leverage of power comes at a cost to non-CAP customers who would be paying even more in subsidies, were there no shopping restrictions, so that CAP customers might earn more reward points to use at a retailer or restaurant. The use of the CAP in this manner would appear to be inconsistent with the Choice Act.

we said PUC has the authority to approve. *CAUSE-PA*, 120 A.3d at 1103. Thus, PUC's approval of the price rate contained in PPL's CAP-SOP, consistent with our holding in *CAUSE-PA*, does not exceed PUC's authority under the Choice Act.

We disagree with RESA's claim that PPL's CAP-SOP goes beyond the rate ceiling we said was permissible for PUC to approve in *CAUSE-PA* because this one and only price is "the ceiling, walls and floor." (RESA Br. at 31.) PPL's CAP-SOP sets a rate ceiling, which, as we stated in *CAUSE-PA*, is permissible. Further, the participation of both an EGS and a CAP customer in the CAP-SOP is voluntary. Thus, a CAP customer is free to drop out of the CAP-SOP and arrange for electric supply **outside of the CAP-SOP** with an EGS, which may be at a rate higher or lower than seven-percent off the PTC. Moreover, if a CAP customer is able to obtain a better offer than the one in the CAP-SOP, the CAP customer is not prevented from doing so, but the CAP customer would then have to pay the entirety of his bill. The record shows that the CAP participation rate of confirmed low-income customers is 24 percent. (R.R. at 225a.) Thus, some low-income customers do choose to shop.

RESA also argues that PPL's CAP-SOP will change a CAP customer's electricity supplier without his consent, which constitutes "slamming." (RESA Br. at 23-24.) However, the CAP-SOP provides that CAP customers operating under an existing contract on June 1, 2017, can finish their contract with an EGS. Once the contract expires, or is terminated by the CAP customer, the CAP customer will have the choice to either return to default service, shop through the CAP-SOP while maintaining CAP benefits, or leave the CAP and shop for an EGS outside of the

26

CAP-SOP. PPL's CAP-SOP does not force a CAP customer to return to default service. Rather, the choice remains with the CAP customer.[30]

RESA also argues that PPL's CAP-SOP violates 52 Pa. Code § 54.10,[31] because it "deprives [a CAP customer] of the 'default' scenario, under which

_____

[30] The Choice Act contains a prohibition against slamming in Section 2807(d)(1) of the Choice Act, 66 Pa. C.S. § 2807(d)(1), which also provides for PUC to establish regulations to ensure that a customer's electricity supplier is not changed by an EDC without the customer's consent. There is no provision in the CAP-SOP that exempts PPL from complying with Section 2807(d)(1) and applicable regulations.

[31] Section 54.10 provides as follows:

An EGS shall provide the following notices to customers prior to the expiration of a fixed term contract or prior to a change in contract terms:

(1) An initial notice shall be provided to each affected customer 45 to 60 days prior to the expiration date of the fixed term contract or the effective date of the proposed change in terms. For customers who have elected to receive electronic communications from the EGS, the notice shall be transmitted in the manner chosen by the customer. The initial notice must include:

(i) A general description of the proposed change in terms of service.
(ii) The date a change shall be effective or when the fixed term contract is to expire.
(iii) An explanation of why a change in contract terms is necessary.
(iv) A statement indicating when a follow-up options notice shall be issued with details regarding the proposed change.
(v) A statement explaining that the options notice must discuss the customer's options to the proposed change in terms of service or expiring fixed term contract.
(vi) A statement indicating whether the existing fixed term contract has a cancellation fee, and an explanation of the fee amount and how to avoid the fee, if possible, including notice of the date when the customer can choose a different product from the customer's existing EGS, choose an alternative EGS or return to default service.

(2) An options notice shall be provided, by first class mail, to each affected customer at least 30 days prior to the expiration date of the fixed term contract

27

or the effective date of the proposed change in terms. The options notice must include:

(i) A statement advising the customer of the specific changes being proposed by the EGS and informing the customer of how to exercise the customer's options, including the customer's ability to accept the proposed changes, to choose another product offering from the customer's existing EGS, to select another EGS or to return to default service.

(ii) Information regarding new pricing or renewal pricing including the price to be charged, per kilowatt-hour, for the first billing cycle of generation service:

  (A) If a customer fails to respond to the options notice and is converted to a month-to-month contract, the EGS shall provide a disclosure statement under § 54.5 (relating to disclosure statement for residential and small business customers).

    (I) Notice of a subsequent change in pricing shall be provided to the customer at least 30 days prior to the new price being charged.

    (II) For customers who have elected to receive electronic communications from the EGS, notice of the change in pricing shall be transmitted in the manner chosen by the customer. For all other customers, notice shall be provided by first class mail.

  (B) If a customer fails to respond to the options notice and is entered into a new fixed term contract, the EGS shall provide the fixed, per kilowatt-hour price to be charged and term length of the contract.

(iii) The telephone numbers and Internet addresses, as applicable, for the Office of Consumer Advocate, the Commission and PaPowerSwitch.com.

(iv) Language clearly visible on the front of the envelope used to provide the options notice stating that it contains important information regarding the expiration or changes in terms of the customer's electric supply contract.

(3) When a customer fails to respond to either notice, the following apply:

  (i) A fixed term contract shall be converted to one of the following:

    (A) A month-to-month contract, either at the same terms and conditions or at revised terms and conditions, as long as the contract does not contain cancellation fees.

    (B) Another fixed term contract, as long as the new contract includes a customer-initiated cancellation provision that allows the customer to cancel at any time, for any reason, and does not contain cancellation fees.

  (ii) The converted contracts shall remain in place until the customer chooses one of the following options:

shopping customers stay with their EGS until **the customer** affirmatively selects another option." (RESA Reply Br. at 17 (emphasis in original).) RESA's position is that under this regulation the EGS must provide two notices to the customer prior to the expiration of a fixed-term contract, explaining the terms of a new contract, how to accept those changes, choose a different product, select another EGS, or return to default service. If the customer fails to respond to those notices, the EGS can convert the expiring contract into either another fixed-term contract, or a month-to-month contract, with that EGS, on the same **or different** terms and conditions (which may be less favorable to the customer). This new contract remains in place until the customer takes affirmative action to elect a different option. However, it appears the CAP-SOP requires the CAP customer to make a decision and does not permit the non-choice to control the new contract with an EGS. For month-to-month contracts, a CAP customer must make a choice when it is time for CAP recertification, to enroll in the CAP-SOP, return to default service, or make a contract outside of the CAP. (R.R. at 420a, ¶ 5(a)-(c).) Thus, we see no proof that the CAP-SOP changes a CAP customer's electricity supplier without his consent or in violation of regulation.

## B.  Substantial Evidence Challenge

### 1.  Contentions of the Parties

RESA argues that PUC failed to satisfy its initial burden of showing substantial reasons why there are no reasonable alternatives to restricting shopping.

---

(A) Select another product offering from the existing EGS.
(B) Enroll with another EGS.
(C) Return to the default service provider.

52 Pa. Code § 54.10.

PUC failed to meet this burden because the data did not demonstrate harm to PPL's USECP as a result of CAP shopping and reasonable alternatives to restricting shopping were available.

On the issue of harm, RESA argues, the data did not show that CAP shopping has eroded the funding, cost-effectiveness, and affordability of PPL's USECP. While PUC focused on CAP shoppers who at some point were billed a price higher than the PTC, the data also showed that about half of all CAP shoppers were billed at or below the PTC. Notwithstanding this, PUC ordered these customers who were experiencing a savings to return to default service, resulting in them paying higher bills. The data also did not show, as PUC claimed, that as a result of CAP shopping, CAP customers were eroding their CAP credits faster. Between January 2, 2012, and October 30, 2015, an average of two percent of CAP participants, both shoppers and non-shoppers, were removed from the CAP because they exceeded their CAP credits. This figure is consistent with the 1.8 percent rate for the period between January 2009 and December 2011, which includes one year prior to when CAP customers could shop. Ultimately, RESA claims, the data PPL provided suffers from the fact that it focuses on a single point in time and does not reflect the conditions CAP shoppers experienced over their entire shopping experience.

On the issue of reasonable alternatives, RESA contends that PPL's initial proposal, to inform CAP or potential CAP customers about PPL's traditional SOP, is a reasonable alternative to restricting their right to shop that mitigates the harms that are allegedly occurring. In addition, RESA continues, PUC did not properly analyze whether there were no reasonable alternatives to restricting shopping. It is not enough for the proponents supporting PPL's CAP-SOP to coalesce around an approach that restricts the right to shop as a means of showing that there is no

30

reasonable alternative.  Also, RESA argues, there was no comprehensive review and assessment of PPL's entire USECP.  As a result, "alternatives to restricting shopping that could have been effectuated within the design of the USECP were not developed."  (RESA Br. at 52.)

Finally, RESA claims that even if PUC met its initial burden, there was substantial evidence in the record showing that the CAP-SOP would not succeed because it included elements that would discourage EGSs from participating in the CAP-SOP.

PUC responds that it met its burden.  PUC argues that RESA misstates the burden of proof.  In *CAUSE-PA*, PUC argues, this Court said that PUC has to provide "*substantial reasons why the restriction on competition is necessary (i.e., there are no reasonable alternatives)*."  (PUC Br. at 22 (emphasis in original) (quoting *CAUSE-PA*, 120 A.3d at 1106).)  This language is simply a restatement of the substantial evidence standard for agency adjudications.  Thus, under *CAUSE-PA*, PUC's determination imposing price restrictions on EGSs serving CAP customers should be upheld if it is supported by substantial evidence.  PUC met that standard. The evidence of record showed the harms both CAP and non-CAP customers were suffering from unrestricted customer shopping.  As to the existence of reasonable alternatives, PUC contends that *CAUSE-PA* did not impose an additional burden on the party proposing a price restriction to prove there is no alternative course of conduct or, stated differently, if there is a single reasonable alternative, then the imposition of a shopping restriction is unlawful.  Again, all that is required is that PUC's evaluation of various alternatives be supported by substantial evidence.  The parties considered other alternatives, but the proponents of PPL's CAP-SOP concluded that PPL's CAP-SOP was the most reasonable alternative.  RESA's

31

proposal to impose no restrictions and encourage CAP customers to use the traditional SOP, PUC concluded, did not protect CAP and non-CAP customers from the negative effects associated with CAP customers paying more than the PTC.

CAUSE-PA adds that, as to the proof of harm, the evidence showed that from January 2012 through February 2015, 34,780 customers were removed from the CAP because they had exceeded their credits, and of this number, 27,600 or 79 percent, were shopping with an EGS during some portion of the prior 18 months. In any case, if the costs of CAP customers increased, someone had to bear those costs. While RESA claims that this harm "'is focused on a single point in time,'" that time period consisted of a 46-month time period and showed a net harm of $228,656 per month. (CAUSE-PA Br. at 47 (quoting RESA Br. at 48).) RESA did not submit any evidence contradicting this proof of harm. As for RESA's claim that PPL's CAP-SOP is bound to fail because EGSs will not participate, PUC correctly concluded that such a claim is speculative. Just 7 of RESA's 21 members operate in the Commonwealth, and even RESA's own witness could only speculate as to the reasons why an EGS might participate in a SOP.

In reply, RESA argues that reasonable alternatives to restricting shopping that PUC did not even consider were to increase or eliminate the CAP credit maximum or to identify solutions within the program design of the USECP. As for non-CAP customers subsidizing the cost for CAP customers, this is merely a public purpose cost, which the General Assembly contemplated in the Choice Act, and the General Assembly's concern that the USECP be appropriately funded and operated in a cost-effective manner has nothing to do with the amount of subsidy that non-CAP customers pay. Indeed, the $2.7 million non-CAP customers paid to subsidize the cost of the CAP amounts to 75 cents a customer.

32

RESA further disagrees with the assertion of PPL and the Intervenors that *CAUSE-PA* imposed merely a substantial evidence requirement as opposed to requiring that there be no reasonable alternative.

### 2. Substantial Evidence Supports the Determinations[32]

In *CAUSE-PA*, we said that "the proponents of the rule restrictions . . . ha[ve] the burden of proof and ultimately the burden to persuade the PUC to enact the proposed restrictions on competition." *CAUSE-PA*, 120 A.3d at 1106-07 (citing 66 Pa. C.S. § 332(a).) We concluded, as previously discussed, that substantial evidence supported PUC's decision to reject the proposed PECO price ceiling, but that PUC's decision to reject the prohibition on early cancellation and termination fees was not supported by substantial evidence. *Id.* at 1107-08. On the issue of the proposed price ceiling, we noted that "it is not our role to reweigh the evidence below or to substitute our judgment for that of the PUC, particularly on matters within the PUC's area of expertise." *Id.* at 1107. In short, we said, "PUC was not persuaded that Petitioners' evidence provided a substantial reason to justify limiting competition by imposing a price ceiling on EGSs as part of the PECO CAP Shopping Plan." *Id.* On the issue of the prohibition on early cancellation and termination fees, we said that "PUC recognized that such fees may impede the ability of CAP customers to escape from unaffordable variable rate contracts, particularly during periods of price spikes." *Id.* at 1107-08. Thus, there appeared to be no dispute that prohibiting early cancellation and termination fees "would provide an added layer of protection to CAP participants." *Id.* at 1108. Moreover, there was no evidence showing that

---

[32] Initially, to the extent RESA reiterates in its substantial evidence challenge that PPL's CAP-SOP should have been considered in the context of PPL's USECP, that contention, as we discuss more fully in Section C.2, is waived.

prohibiting early cancellation and termination fees "would be anti-competitive and limit the choices available to CAP participants." *Id.* at 1107. While PUC had rejected the proposal on prohibiting cancellation and early termination fees on the ground that consumer education would suffice, we said that "[s]tatutorily-mandated disclosures and prohibiting early cancellation/termination fees . . . are not mutually exclusive, especially where there is a lack of evidence that the latter would adversely affect the competitive marketplace for CAP participants." *Id.* at 1108.[33]

Therefore, what *CAUSE-PA* requires, in order for a rule restriction to survive our review, is that there be substantial evidence in the record showing a substantial reason why a restriction on competition is necessary, that is to say, there are no reasonable alternatives to restricting competition. Stated simply, the CAP-SOP, as it constitutes a restriction on competition, must be necessary. A restriction on competition is necessary when, one, there is a harm associated with competition and, two, there is no reasonable alternative to the rule that restricts competition. *Id.* at 1103-04. PPL, CAUSE-PA, OCA, and I&E, as the proponents of PPL's CAP-SOP, bore the burden of proof on both these showings, and, again, we review PUC's determination on whether the proponents met their burden of proof under our substantial evidence standard.[34]

On the issue of harm, the evidence presented showed that between January 2012 and October 31, 2015, on average, nearly 10,000 CAP customers each month

---

[33] One can say from the determination on the issue of early cancellation and termination fees that competition did not need to bend because such fees did not affect competition at all.

[34] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Emporium Water Co. v. Pa. Pub. Util. Comm'n*, 955 A.2d 456, 463 (Pa. Cmwlth. 2008) (citation omitted). Our review focuses "on whether there is rational support in the record, when reviewed as a whole, for the agency action." *Id.* (citation omitted). In order to reverse, we "must conclude that the findings of the agency are totally without support in the record." *Id.* (citation omitted).

were paying above the PTC. (R.R. at 122a, 248a-49a.) These customers, together, were paying each month, on average, $298,406 more than had they simply paid the PTC. (R.R. at 123a, 147a.) Even when these overpaying CAP customers were considered together with those CAP customers who were paying below the PTC, the CAP was still more costly than the PTC, in the amount of $228,656 each month, or more than $2.7 million a year. (R.R. at 125a, 154a-55a.) This evidence was "**unrefuted**." (PUC Op. and Order at 53, Oct. 27, 2016 (emphasis added).) This data did not focus "on a single point in time[;]" rather this data spanned 46 months. (RESA Br. at 48.) Thus, we disagree with RESA's claim that this data, showing that about half of CAP shoppers each month were paying above the PTC, is "not reflective of the conditions experienced by CAP shoppers over their entire shopping experience." (*Id.*) There is substantial evidence to support PUC's finding this data demonstrated a pattern of a significant number of CAP customers overpaying for electricity.

Moreover, as a natural corollary to overpayment, there was substantial evidence that these CAP customers eroded their CAP credits more quickly. The data showed that between January 2012 through February 2016, 34,780 CAP customers were removed from the CAP, and of this number, 27,600 shopped with an EGS at some point. (R.R. at 264a.) Since CAP customers only pay a portion of their bill, non-CAP customers had to pay greater subsidies than had CAP customers simply paid the PTC. *See CAUSE-PA*, 120 A.3d at 1103 (noting that the Choice Act "expressly requires the PUC to administer [low-income programs such as the CAP] in a manner that is cost-effective for both the CAP participants and the non-CAP participants"). In short, substantial evidence supports PUC's determination that

35

unrestricted shopping for CAP customers was resulting in harm both to CAP and non-CAP customers.

Based on PUC's determination that harm was occurring as a result of unrestricted competition, some restriction on competition was permitted. During the proceedings, the parties submitted their own proposals on how to mitigate the harm resulting from CAP shopping. With the exception of PPL's initial proposal, all of the other proposals involved some restriction on competition. For example, both OCA and CAUSE-PA initially proposed a price ceiling, albeit at a rate higher than what PUC ultimately adopted. Only PPL proposed, at least initially, that CAP customers simply be encouraged to participate in PPL's traditional SOP. However, the ALJ and PUC concluded that this alternative is not reasonable, which is supported by the fact that the traditional SOP has been available to CAP customers and it has not mitigated the harms associated with unrestricted shopping. (R.R. at 157a, 188a, 190a.)

There is no evidence that the alternative RESA proposes now, which was not raised before PUC, to raise or eliminate the maximum CAP credits is reasonable or would mitigate the harm to non-CAP customers. Because RESA did not raise this before PUC, PUC did not have an opportunity to consider it and there is no record to support its reasonableness. There is an argument that this alternative may have the effect of exacerbating the harm to non-CAP customers. A CAP customer only pays a portion of his bill and, thus, having a CAP credit arguably creates an incentive for a CAP customer to seek the lowest price for electricity so as not to exhaust his CAP credits.

Given the foregoing, we conclude that PUC did not err in finding that proponents of the CAP-SOP proved, on this record, that there were no reasonable

36

alternatives to restricting competition. It is clear that after months of discovery and several rounds of testimony, the experts and industry leaders involved in this proceeding could conceive of only a single alternative to restricting competition, and this restriction was not a reasonable one. In short, substantial evidence supports PUC's determination on the lack of reasonable alternatives to restricting competition. *Cf. CAUSE-PA*, 120 A.3d at 1107 (noting that petitioners failed to convince PUC that customer education programs were not a reasonable alternative to price regulation).

Finally, there is substantial evidence in the record to support PUC's conclusion that EGSs will participate in PPL's CAP-SOP, and RESA's contention to the contrary was speculative. The evidence in the record showed that there is extensive EGS participation in the traditional SOP, which is the model for PPL's CAP-SOP, and that RESA represents only a portion of those EGSs who participate in PPL's traditional SOP. (PUC Op. and Order at 59-61, 66, Oct. 27, 2016.) Moreover, even RESA's own witness, White, could not "speculate on the reasons each EGS participates in a SOP." (R.R. at 415a.)

### C. Alleged Due Process Violation

#### 1. Contentions of the Parties

RESA argues that its right to procedural due process was violated because the ultimate restrictions PUC adopted were not offered into the record until the rejoinder phase of the proceeding, which was after three rounds of written testimony and nearly five months of discovery. While RESA acknowledges that cross-examination was available on PPL's rejoinder proposal, RESA argues that this is not the same as having a full and fair opportunity to consider a new proposal, seek discovery, and

37

present responsive evidence. Once PPL decided to support the CAP-SOP CAUSE-PA proposed, with modifications, PUC should have undertaken a full review of PPL's USECP in order to afford RESA due process, as well as to comply with what this Court said in *CAUSE-PA*.

PUC responds that, assuming RESA has a protected property interest, RESA was afforded due process. While the CAP-SOP that was ultimately approved was introduced during the rejoinder phase of the proceeding, RESA had the opportunity to engage in cross-examination, along with other procedural actions, but it declined to do so. "It would be unrealistic, impossible and inefficient to require all proposals ultimately adopted to be introduced in the earliest stages of a proceeding." (PUC Br. at 32.)

CAUSE-PA adds that RESA was put on notice, from the inception of this proceeding, that the issue of unrestricted CAP shopping was going to be litigated. Thereafter, at every stage of the proceeding – direct, rebuttal, sur-rebuttal, and rejoinder – the issue of reasonable and appropriate CAP shopping restrictions was discussed through the proposals the parties and Intervenors offered. RESA had the opportunity to respond to these proposals directly or it could have cross-examined the witnesses about these proposals. Since RESA did not object to any of the evidence that was admitted, and since it waived cross-examination, RESA "cannot readily complain about due process." (CAUSE-PA Br. at 37-38.).

### 2. Waiver

Issues raised for the first time on appeal are waived, including most constitutional rights, such as the right to due process. *Pa. Bankers Ass'n v. Pa. Dep't of Banking*, 962 A.2d 609, 621-22 (Pa. 2008); *see Hudock v. Pa. Dep't of Pub.*

*Welfare*, 808 A.2d 310, 313 n.4 (Pa. Cmwlth. 2002) ("When a party fails to raise an issue, even one of a constitutional dimension, in an agency proceeding, the issue is waived and cannot be considered for the first time in a judicial appeal").

RESA never argued before PUC that it had been deprived of due process because the CAP-SOP that PUC ultimately approved was not proposed until PPL's rejoinder testimony was waived. Even when RESA petitioned for rescission/amendment of the October 27, 2016 Order, and argued that the details of PPL's CAP-SOP were not placed into the record until PPL's rejoinder, it did so in the context of requesting that the matter be remanded to the ALJ so that a full record might be developed on other reasonable alternatives, and not on the basis that RESA had been deprived of its constitutional right to due process. Moreover, RESA does not cite to the record in its brief showing where it raised this issue before PUC, as required by Rules 2117(c) and 2119(e) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 2117(c) and 2119(e), and our independent review of the record does not reveal that this issue was raised before PUC. Therefore, we conclude that this issue is waived.[35]

Likewise, RESA's complaint that the issue of the CAP should have been reviewed in the context of the USECP is also waived.[36] In 2014, following PPL's filing of its USECP, PUC concluded that CAP shopping was beyond the scope of the USECP proceeding and directed PPL to address its CAP as part of its next DSP. (R.R. at 102a, 119a.) RESA did not timely object to the issue of having CAP

---

[35] Even if the issue was not waived, assuming RESA has a protected property interest at stake, we would conclude that RESA was not deprived of due process.

[36] RESA does not cite to the record in its brief showing where it raised this issue before PUC, as required by Rules 2117(c) and 2119(e) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 2117(c) and 2119(e), and our independent review of the record does not reveal that this issue was raised before PUC.

shopping addressed in that context. Instead, RESA addressed the issue of CAP shopping on the merits. *See Commonwealth v. U.S. Mineral Prods. Co.*, 927 A.2d 717, 734 n.11 (Pa. Cmwlth. 2007) (citation omitted) (noting that "one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal"), *aff'd*, 956 A.2d 967, 978 (Pa. 2008).

### D. Alleged Regulatory Taking

#### 1. Contentions of the Parties

RESA argues that approval of PPL's CAP-SOP constitutes a regulatory taking because it interferes with an EGS's reasonable investment-backed expectations by denying it the economically viable use of its existing contract rights and potential future customers.

PUC responds that an EGS's participation in PPL's CAP-SOP is entirely voluntary and, therefore, there is no taking.

CAUSE-PA adds that PPL's CAP-SOP does not constitute a regulatory taking because it does not foreclose all productive economic activity of any EGS in the Commonwealth. The CAP-SOP does not implicate any of the relationships that an EGS has with a non-CAP customer within PPL's service territory.

#### 2. Waiver

Again, as with RESA's claims about being deprived of due process, its claim that PPL's CAP-SOP constitutes a regulatory taking is waived because RESA did

not raise this issue before PUC.[37] *See Tri-State Transfer Co., Inc. v. Dep't of Envtl. Prot. Tinicum Twp.*, 722 A.2d 1129, 1132 (Pa. Cmwlth. 1999) (concluding that appellant's claim that voiding of its solid waste permit constituted a regulatory taking was not raised before the Environmental Hearing Board and, therefore, the issue was waived).[38]

<hr />

[37] RESA does not cite to the record in its brief showing where it raised this issue before PUC, as required by Rules 2117(c) and 2119(e) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 2117(c) and 2119(e), and our independent review of the record does not reveal that this issue was raised before PUC.

[38] Even if we were to review this issue, we would conclude that PPL's CAP-SOP does not constitute a taking because an EGS's participation in the CAP-SOP, which affects a small percentage of PPL's 1.4 million customers, is voluntary. *N. Area Pers. Care Home Adm'rs. Ass'n v. Dep't of Pub. Welfare*, 899 A.2d 1182, 1191 (Pa. Cmwlth. 2006) (holding that because petitioner voluntarily participates in Medicare Program and is under no compulsion to provide services to Medicare residents, increased costs associated with new regulations promulgated by the Department of Public Welfare, which petitioner claimed it would be unable to recoup from Medicare, did not constitute a regulatory taking), *aff'd per curiam*, 919 A.2d 187 (Pa. 2007).

## III. Conclusion

For the reasons set forth above, we hold as follows: PUC has the authority under the Choice Act to implement PPL's CAP-SOP and substantial evidence supports PUC's determination to implement PPL's CAP-SOP; PPL's CAP-SOP does not result in governmental slamming; and RESA's contentions that its due process rights were violated, that the issue of the CAP should have been reviewed in the context of the USECP, and that the CAP-SOP constitutes a regulatory taking are all waived. Therefore, we affirm the Opinions and Orders of PUC.

_____
**RENÉE COHN JUBELIRER,** Judge

Judge Fizzano Cannon did not participate in the decision in this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Retail Energy Supply Association,    :
                    Petitioner    :
                                :
               v.             :    No. 230 C.D. 2017
                                :
Pennsylvania Public Utility     :
Commission,                    :
                  Respondent   :

## O R D E R

**NOW**, May 2, 2018, the Opinions and Orders of the Pennsylvania Public Utility Commission, entered October 27, 2016, and January 26, 2017, are hereby **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** Judge

Retail Energy Supply Association,      :
                Petitioner      :
                                  :   No.  230 C.D. 2017
             v.                 :
                                    :   Argued:  December 6, 2017
Pennsylvania Public Utility      :
Commission,                     :
                Respondent      :

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
                 HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE ROBERT SIMPSON, Judge
                 HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE MICHAEL H. WOJCIK, Judge

CONCURRING OPINION
BY JUDGE McCULLOUGH                        FILED:  May 2, 2018

I concur with the analysis and result reached by the Majority because it appears that the Public Utility Commission (PUC) has implemented a rule consistent with my recommendation in my dissent to *Coalition for Affordable Utility Services and Energy Efficiency in Pennsylvania v. Pennsylvania Public Utility Commission*, 120 A.3d 1087, 1109 (Pa. Cmwlth. 2015) (McCullough, J., dissenting), *appeal denied*, 136 A.3d 983 (Pa. 2016).

In *Coalition*, I agreed with the Court's remand of the case for PUC approval of a rule that would protect Customer Assistance Program (CAP) participants from early contract cancellation and termination fees that electric generation suppliers (EGSs) might otherwise impose.  120 A.3d 1109.  However, I also noted that I would instruct the PUC on remand to approve a rule that would

impose a price ceiling on the EGSs that participate in PECO Energy Company's (PECO's) CAP shopping program, since the omission of such a protection for CAP customers would leave them vulnerable to possible bait and switch tactics by EGSs that the elimination of cancellation fees would not remedy. On that basis, I noted I would have remanded the case with the additional instruction that the PUC hold a hearing to determine whether universal service plans are properly funded and cost effective under section 2804(9) of the Electricity Generation Customer Choice and Competition Act (Choice Act), 66 Pa.C.S. §2804(9).

Here, the PUC did consider that question and determined that the original CAP program was not for the reasons set forth by the Majority. *See* slip op. at 3, 7-8. Consequently, the PUC adopted the noted CAP-Standard Offer Program (CAP-SOP), which imposes price ceilings and thereby ensures that it is properly funded and cost effective in accordance with section 2804(9). With regard to whether the CAP-SOP program properly affords the necessary competition as contemplated by the Choice Act, I join the Majority's holding that it does.

_____
PATRICIA A. McCULLOUGH, Judge