| | | |
|---|---|---|
| Sunoco Pipeline, L.P., | : | **CASES CONSOLIDATED** |
| Petitioner | : | |
| | : | |
| v. | : | Nos. 1415-1419 C.D. 2021 |
| | : | No. 1421 C.D. 2021 |
| Public Utility Commission, | : | Argued:  December 15, 2022 |
| Respondent | : | |

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
HONORABLE LORI A. DUMAS, Judge
HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION
BY SENIOR JUDGE LEAVITT                        FILED:  May 5, 2023

Sunoco Pipeline, L.P. (Sunoco) petitions for this Court's review of an adjudication[1] of the Pennsylvania Public Utility Commission (Commission) that imposed a civil penalty in the amount of $2,000 for violations of the Pennsylvania Public Utility Code[2] and federal regulations applicable to gas pipelines.[3]  Sunoco contends that the Commission erred and abused its discretion.   First, the federal regulations on pipeline construction were not an issue raised in any of the formal complaints adjudicated by the Commission.  Second, Sunoco cannot be sanctioned or ordered to revise its public awareness program unless or until the Commission promulgates a regulation that authorizes the ordered revisions.  The Commission has filed a motion to dismiss Sunoco's appeal of its adjudication related to the construction of Sunoco's pipelines as moot because those pipelines are no longer

---

[1] This matter comes before this Court on six separate petitions for review filed by Sunoco in response to the Pennsylvania Public Utility Commission's (Commission) opinion and order entered at consolidated dockets Nos. C-2018-3006116, P-2018-3006117, C-2018-3003605, C-2018-3005025, C-2018-3006898 and C-2018-3006900.  By order of February 25, 2022, this Court consolidated the cases for review.

[2] 66 Pa. C.S. §§101-3316.

[3] The federal Pipeline and Hazardous Materials Safety Administration, or PHMSA, promulgated pipeline safety regulations found in 49 C.F.R Parts 191-193, 195 and 199, which the Commission adopted in Section 59.33(b) of its regulations, 52 Pa. Code §59.33(b).

transporting highly volatile liquids (HVLs).  For the reasons to follow, we deny the Commission's motion to dismiss, and we reverse in part and affirm in part the Commission's remediation and civil penalty order to Sunoco.

## Background

Since 2014, as authorized by its certificates of public convenience, Sunoco has transported HVLs, including butane, ethane and propane or a combination thereof, between Delmont, Westmoreland County, and Twin Oaks, Delaware County.  Sunoco's Mariner East pipeline system consists of three pipelines.  The Mariner East 1 (ME1) is an 8-inch diameter pipeline built in the 1930s that has been repurposed to transport HVLs.  The Mariner East 2 (ME2) is a newly constructed 20-inch diameter pipeline that, at certain points, uses a 12-inch "workaround pipeline" that was also built in the 1930s.  The Mariner East 2X (ME2X) is a new 16-inch diameter pipeline under construction.  Administrative Law Judge Initial Decision at 21-22, Findings of Fact (F.F.) Nos. 45-48.

Between July 2018 and January 2019, several formal complaints were filed to challenge Sunoco's Mariner East pipelines as unsafe and not providing a reasonable utility service.  The formal complaints were filed by Meghan Flynn, Rosemary Fuller, Michael Walsh, Nancy Harkins, Gerald McMullen, Caroline Hughes, and Melissa Haines (Flynn Complainants); the Andover Homeowners' Association, Inc. (Andover); Melissa DiBernardino; Rebecca Britton; and Laura Obenski (collectively, Complainants) and Aligned Intervenors.[4] The formal complaints sought to stop the operation of the ME1 and ME2 pipelines and construction of the ME2X pipelines, including the workaround pipelines used for

---

[4] The Aligned Intervenors include Downingtown Area School District, Rose Tree Media School District, Twin Valley School District, East Goshen Township, West Whiteland Township, Uwchlan Township, Middletown Township, Delaware County, West Chester Area School District, Thornbury Township, Chester County, Edgmont Township, Clean Air Council, and Senator Thomas Killion.  Chester County and Clean Air Council have filed briefs in support of the Commission.

HVLs. In the alternative, the complaints sought to have Sunoco ordered to take certain measures to protect public safety, including an enhancement to its public awareness program and integrity management plan.

More specifically, the Flynn complaint alleged that Sunoco's ME1 and workaround pipelines and valve stations have been unlawfully sited in densely populated areas of Chester and Delaware Counties. A large HVL leak at any location along the ME1 or a workaround pipeline creates the risk of "hundreds of fatalities." Flynn Second Amended Complaint ¶30; Reproduced Record at 152a (R.R. __). The complaint also alleged that Sunoco failed to establish an adequate emergency planning and public awareness program, as required by Section 1501 of the Public Utility Code, 66 Pa. C.S. §1501; the Commission's regulation at 52 Pa. Code §59.33; and the federal regulation at 49 C.F.R. §195.440 (governing public awareness). The complaint further alleged that Sunoco did not meet the federal minimum safety standards in light of a 2017 leak in Morgantown, Pennsylvania, and a 2018 rupture in Beaver County, Pennsylvania. Due to these safety problems, the complaint requested the Commission to order an independent party to do a "remaining life study" on Sunoco's ME1 and workaround pipelines in Chester and Delaware Counties. Flynn Second Amended Complaint at 36; R.R. 179a.

The DiBernardino complaint averred, *inter alia*, that Sunoco installed its pipelines in unstable soil; with coating flaws; and too close to other HVL pipelines, which was "too dangerous to be permitted." DiBernardino Complaint ¶14; R.R. 264a. The complaint alleged that Sunoco violated federal safety regulations by repurposing the pipelines built in the 1930s that "ha[ve] a long history of leaks," including a 2018 leak in Delaware County. DiBernardino Complaint ¶16; R.R. 264a. The complaint questioned the integrity of the "1930s pipelines" and requested the Commission to require Sunoco to establish "a credible and adequate emergency/evacuation plan[.]" DiBernardino Complaint at 15; R.R. 270a. The

3

complaint challenged Sunoco's existing public awareness program under 49 C.F.R. §195.440 as inadequate because it did not explain how a gas leak would be detected or be communicated to the public. Further, school districts and municipalities have received "inadequate responses, or none at all" to their requests for information needed for their emergency response planning. DiBernardino Complaint ¶23; R.R. 266a. The complaint requested the Commission to order Sunoco to suspend all horizontal directional drillings for installation of the ME2 and ME2X pipelines until "the risk to the public" is assessed and the "necessary geo-physical tests and analyses" are performed. DiBernardino Complaint at 15; R.R. 270a.

The Britton complaint asserted that because Sunoco's public awareness program accounted only for those living within the 1000-foot impact radius, it was insufficient. The Mariner East pipelines run through high consequence areas with private dwellings, industrial buildings, and places of public assembly, in violation of 49 C.F.R. §195.210(a). The complaint alleged that a valve station in Upper Uwchlan Township presents an unreasonable risk to school students and staff across the street. Britton Complaint ¶32; R.R. 370a-71a. The complaint asserted that Sunoco's public awareness program violated 49 C.F.R. §195.440 because it did not provide sufficient information. Britton Complaint ¶¶11-14; R.R. 364a-65a. It also raised concerns about the impact of Sunoco's horizontal drilling upon public drinking water. The Britton complaint requested the Commission to find that Sunoco's public awareness program, emergency alert system, and evacuation procedures did not constitute safe and reasonable services, as required under 66 Pa. C.S. §1501. Britton Complaint at 22-24; R.R. 376a-78a.

The Obenski complaint also alleged that Sunoco's public awareness program violated 49 C.F.R. §195.440 because it was not sufficiently informative on leak detection and evacuation procedures. Obenski Complaint ¶1; R.R. 635a-37a. School districts were unable to maintain "updated, actionable, and reliable

4

emergency preparedness plans" due to "lack of cooperation from Sunoco." Obenski Complaint ¶3; R.R. 638a. The complaint requested, *inter alia*, that the Commission find that Sunoco's public awareness program "has resulted in significant gaps in the ability of" local government to "appropriately plan for the hazards introduced by the Mariner East Project[.]" Obenski Complaint at 8-9; R.R. 640a-41a.

Finally, Andover's complaint asserted that Sunoco's public awareness program violated 49 C.F.R. §195.440 because it had left the association's members "without either a credible notification system or emergency plan." Andover Complaint ¶98; R.R. 749a. This was unreasonable because the ME1 leaked three times in 2016 and 2017, and the 12-inch workaround pipeline has leaked at least four times in Chester and Delaware Counties since 1987. Andover Complaint ¶77; R.R. 745a. Andover asserted that Sunoco's emergency evacuation plan, *i.e.*, "immediate on-foot self-evacuation in the correct upwind or uphill direction," was not workable, particularly for evacuations at night or during inclement weather. Andover Complaint ¶93; R.R. 748a. Andover alleged that it had made numerous requests of Sunoco "for a credible notification system and evacuation guidance" but received neither. Andover Complaint ¶81; R.R. 746a. Andover requested the Commission to order Mariner East operations limited or stopped until Sunoco provides a "comprehensive risk assessment and credible notification and evacuation plan." Andover Complaint at 23; R.R. 751a.

The complaints were assigned to an Administrative Law Judge (ALJ) for disposition. By order of June 6, 2019, the ALJ consolidated the proceedings on the formal complaints. The ALJ's order identified "six central issues" that follow:

(1) the safety and integrity of ME1, ME2, ME2X, and the 12-inch pipeline;

(2) the safety of the location of the pipelines and related equipment (i.e. valve stations);

(3) the adequacy of Sunoco, L.P.'s public awareness program;

5

(4) the adequacy of Sunoco, L.P.'s emergency response procedures and training;

(5) Sunoco, L.P.'s integrity management protocols; and

(6) the safety of the construction of ME2 and ME2X.

ALJ Order, 6/6/2019, at 4; R.R. 845a.

The ALJ conducted in-person hearings in 2019, at which members of the public appeared. Sunoco, Complainants and Aligned Intervenors all filed written direct and rebuttal testimony between January and August of 2020. The ALJ then conducted evidentiary hearings from September 29, 2020, to October 9, 2020, and on October 13-14, 2020. All parties filed post-hearing briefs.

On April 12, 2021, the ALJ issued an Initial Decision denying Complainants' request that Sunoco cease construction and operation of the Mariner East pipelines. The ALJ reasoned that the Commission lacked jurisdiction over pipeline siting; regardless, the location of the Mariner East pipelines and the valve stations complied with both state and federal law. The ALJ also concluded that Complainants and Aligned Intervenors failed to prove that Sunoco violated the integrity management[5] provision in 49 C.F.R. §195.452 or the cathodic protection provision in 49 C.F.R. §195.571. The ALJ found that Sunoco followed its integrity management plan, which treats all segments of the Mariner East pipelines in Chester and Delaware Counties as if they are located in a high consequence area. ALJ Initial Decision at 115. Because the integrity management program requires on-going testing, maintenance, and repair of the pipelines to keep them in compliance with regulatory requirements, the ALJ denied Complainants' request that Sunoco hire an

---

[5] "Integrity management" refers to a process in which pipeline operators "devote additional resources to preventing and mitigating hazards to pipeline safety within [high consequence areas]." Commission Adjudication at 24 n.8. As the Commission explained, the federal pipeline safety regulations use the concept of "high consequence areas," or HCA, to "identify specific locales and areas where a failure could have the most significant adverse consequences." *Id.* The federal regulations require "the use of an in-line inspection device or comparable technology to ensure hazardous liquid pipeline integrity within HCAs." *Id.*

6

independent party to conduct a "remaining life study" on the ME1 and the workaround pipelines. *Id.* at 112.

The ALJ determined, however, that Sunoco had violated Section 1501 of the Public Utility Code, 66 Pa. C.S. §1501, in two ways. First, the ME1 and the workaround pipelines did not satisfy the depth of cover and spacing regulations set forth in 49 C.F.R. §§195.210(b), 195.248, and 195.250. Second, Sunoco's public awareness program did not satisfy the requirements of 49 C.F.R. §195.440.

**Depth of Cover and Distance of Pipelines**

With respect to the violation of 49 C.F.R. §§195.210(b), 195.248, and 195.250, the ALJ relied on the presentation of complainant Gerald McMullen that the ME1 is located within 50 feet of several homes, including his, as well as the Chester County Library. He testified that the ME1 is "shallow," as are the "new pipelines that are proposed to go in." Notes of Testimony (N.T.), 10/23/2019, at 979; R.R. 929a. McMullen presented a photograph of an 8-inch ME1 pipeline and another pipeline that were exposed in a dry creek bed near Whiteland West Apartments. R.R. 950a. Another one of McMullen's photographs showed that an underground pipeline transected a ball field. R.R. 952a.

As to the distance between the pipelines, McMullen presented an exhibit he created indicating "the distances between the two existing pipelines and the two proposed pipelines" between his home and the Chester County Library. N.T. 951; R.R. 901a. The exhibit showed the ME1 and the 12-inch workaround pipelines placed 25 feet apart, and the ME1, ME2X, ME2, and the workaround pipelines placed 8 to 9 feet apart from each other. *Id.*; *see also* R.R. 946a. McMullen also presented a photograph taken from his property showing Sunoco pipeline markers. He testified, in relevant part:

> Following the markers straight down, that is [ME]1. The markers to the right of that are the potential path of [ME]2X.

7

> Right on the other side of that wooden fence is [ME]2, and closest to the library is the 12-inch workaround line.

N.T. 952; R.R. 902a. McMullen expressed concern that "there are four pipes in such a small space" because, should there be a leak or an accident, he and other residents would have difficulty in following Sunoco's recommendation to evacuate from the scene, "upwind, uphill," on foot. N.T. 951-52; R.R. 901a-02a. In addition, McMullen presented photographs of a parking lot in Exton, Chester County, showing markers on the ground for two pipelines buried underneath, one of them being ME1, but he did not specify the distance between the two pipelines. R.R. 951a.

Based on McMullen's testimony about the shallow pipes and photographs, the ALJ found that the ME1 pipeline is not always covered with 48 inches of ground cover when located within 50 feet of dwellings, as required under 49 C.F.R. §195.210(b).[6] ALJ Initial Decision at 93. Nevertheless, the ALJ acknowledged that neither complainants nor Sunoco "offered any measurements regarding depth of cover of a pipe within 50 feet of the library and Mr. McMullen's house." *Id*. The ALJ explained, however, that her finding was consistent with the Pennsylvania Department of Environmental Protection's September 11, 2019, order,

---

[6] It states:

> (b) No pipeline may be located within 50 feet (15 meters) of any private dwelling, or any industrial building or place of public assembly in which persons work, congregate, or assemble, unless it is provided with at least 12 inches (305 millimeters) of cover in addition to that prescribed in §195.248.

49 C.F.R. §195.210(b). Section 195.248(a) provides:

> (a) Unless specifically exempted in this subpart, all pipe must be buried so that it is below the level of cultivation. Except as provided in paragraph (b) of this section, the pipe must be installed so that the cover between the top of the pipe and the ground level, road bed, river bottom, or underwater natural bottom (as determined by recognized and generally accepted practices), as applicable, complies with the following table [requiring a maximum of 36 inches of coverage in industrial, commercial, and residential areas].

49 C.F.R. §195.248(a).

8

which directed Sunoco to cover exposed pipelines at 43 locations across the state, one of which involved the transport of HVLs. *Id*. at 97.

The ALJ found that Sunoco violated 49 C.F.R. §195.250, which requires a 12-inch separation between pipelines transporting HVLs and underground structures.[7] Despite McMullen's testimony and his diagram showing that the ME1, ME2X, ME2, and the workaround pipelines are about 8 to 9 *feet* apart from each other, the ALJ found that the pipelines under the parking lot and between McMullen's home and the Chester County Library were placed approximately 8 *inches* apart.

In making these findings, the ALJ observed that Matt Gordon, senior director of Sunoco operations in Chester and Delaware Counties, did not refute McMullen's testimony. With regard to McMullen's photographs of exposed pipelines in the streambed next to Whiteland West Apartments, Gordon testified that those pipelines had been abandoned and were no longer in use. He could not recall the distance between those two exposed pipelines. Gordon testified there is 48 inches of cover over ME2, but he did not speak to the depth of cover over ME1 or the 12-inch workaround pipeline near McMullen's home, which McMullen described as "shallow." ALJ Initial Decision at 93. The ALJ took judicial notice of Gordon's testimony in a prior proceeding, *Dinniman v. Sunoco Pipeline, L.P.*, P-2018-3001453 and C-2018-3001451 (*Dinniman* Proceeding),[8] that "10 feet

---

[7] Section 195.250 provides:

> Any pipe installed underground must have at least 12 inches (305 millimeters) of clearance between the outside of the pipe and the extremity of any other underground structure, except that for drainage tile the minimum clearance may be less than 12 inches (305 millimeters) but not less than 2 inches (51 millimeters). However, where 12 inches (305 millimeters) of clearance is impracticable, the clearance may be reduced if adequate provisions are made for corrosion control.

49 C.F.R. §195.250.

[8] In that case, state senator Andrew E. Dinniman filed a formal complaint with the Commission seeking to enjoin Sunoco's operation of ME1 and the construction of ME2 and ME2X in West

separation was a standard distance buffer between the ME1 and ME2 and ME2X pipelines." ALJ Initial Decision at 94.

The ALJ concluded that Sunoco did not refute Complainants' evidence that the ME1 was not buried at the correct depth and was too close to the other pipes.

**Public Awareness Program**

With regard to Sunoco's public awareness program, the ALJ made numerous and detailed findings. Beginning in 2014, Sunoco has done public awareness mailings for the Mariner East pipelines: one to the affected public; one to excavators and public officials; and one to emergency responders. The public pamphlet and emergency responder pamphlet state that natural gas liquids (NGLs) are

> flammable and can ignite when [they] come[] into contact with an ignition source. Exposure can cause moderate irritation including headaches and dizziness. NGL may contain hydrogen sulfide $H_2S$.

ALJ Initial Decision at 134 (citing Sunoco Exhibits GG-1 and GG-2). However, the pamphlets do not mention "death, burns, serious injuries, frostbite or asphyxiation" as possible consequences of a pipeline rupture or ignition. ALJ Initial Decision at 49, F.F. No. 244. In the event of a leak, the pamphlets advise one to leave the area on foot to a safe distance; warn others; turn off electrical equipment; and call 911. Each individual must determine a "safe distance" on a case-by-case basis. *Id*. at 51, F.F. No. 261. The pamphlets do not address the evacuation of individuals with physical or mental limitations.

---

Whiteland Township that had allegedly caused sinkholes. The Commission affirmed the ALJ's emergency interim order directing Sunoco to cease construction of ME2 and ME2X. This Court reversed the Commission's adjudication in *Sunoco Pipeline L.P. v. Dinniman*, 217 A.3d 1283 (Pa. Cmwlth. 2019), and remanded the matter to the Commission with instructions to dissolve the interim emergency injunction and dismiss Dinniman's complaint for lack of standing.

Since 2014, Sunoco has developed and maintained websites with information about the Mariner East pipelines, including one dedicated specifically to pipeline safety. ALJ Initial Decision at 53, F.F. No. 270. Sunoco has also disseminated public awareness and safety information about the Mariner East pipelines through social media. *Id*., F.F. No. 271. Since 2016, Sunoco has used billboards, radio advertising, and television advertising to provide information about the Mariner East pipelines. *Id*., F.F. No. 272. Sunoco has held open houses in Chester and Delaware Counties to provide information about the construction of the Mariner East pipelines. Sunoco has engaged a consultant that specializes in community planning and emergency preparedness, and Sunoco has met with school districts in Delaware and Chester Counties. *Id*., F.F. No. 276.

In 2019, Sunoco's public awareness program was audited as part of the Public Awareness Program Effectiveness Research Survey ("PAPERS"), a program developed by the American Petroleum Institute (API). ALJ Initial Decision at 54, F.F. No. 277. The audit concluded that Sunoco's public awareness program "was effective in achieving program objectives and was comparable to the other pipeline operators' programs." *Id*., F.F. No. 278.

Additionally, Sunoco meets with emergency responders in Delaware and Chester Counties every other month to provide training, tours, and exercises. ALJ Initial Decision at 59-63, F.F. Nos. 314-45. Gregory Noll, Sunoco's expert witness in emergency planning and emergency response training, conducted Mariner Emergency Responder Outreach (MERO) trainings in Delaware and Chester Counties in 2017 and 2020. Sunoco participates in annual Coordinated Response Exercises (CoRE) for emergency responders in Delaware and Chester Counties. Sunoco participates in bi-weekly meetings with townships across Delaware and Chester Counties and monthly meetings with Chester County Association of Township Officials to provide project updates. The ALJ found that the level of

11

training and funding for equipment provided by Sunoco in Delaware and Chester Counties exceeds that of any other NGL pipeline operator in these counties. ALJ Initial Decision at 59, F.F. No. 320.

Sunoco's MERO training provides that the decision to evacuate or shelter in place should be made by the emergency responder on a case-by-case basis. Delaware County has adopted an emergency response plan that includes factors to be considered in making that decision. *Id*. at 55, F.F. No. 290. Accordingly, Sunoco does not provide notice of a pipeline release directly to schools and municipalities.

The ALJ found that Sunoco must directly notify schools and municipalities in the event of a rupture or release because they are also "first responders." *Id*. at 57, F.F. Nos. 302-03. Municipalities and school districts are required to create their emergency response plans under the Emergency Management Services Code, 35 Pa. C.S. §§7101-79A33, and they need information from Sunoco to develop their plans. ALJ Initial Decision at 60, F.F. No. 323. The information Sunoco has provided to municipalities and school districts in Delaware and Chester Counties includes:

> (i) the location of the pipelines; (ii) the location of the valve stations; (iii) proximity to schools; (iv) the products in pipelines and their physical properties; (v) the hazards of those products; (vi) a rule of thumb for a safe distance in the event of a significant release; (vii) the direction of flow of product in the pipelines; (viii) that in the event of a catastrophic release the product between the corresponding valve sites will be released; (ix) plume modeling; (x) [Sunoco's] integrity management, security and PHMSA compliance programs; and (xi) [Sunoco's] remote monitoring center for leak detection.

ALJ Initial Decision at 60, F.F. No. 324 (quotations omitted).

In sum, the ALJ found that Sunoco's public awareness program satisfied "many requirements" of the federal pipeline safety regulations, including the use of a one-call notification system, identification of a pipeline release, steps to

12

take in the event of a release, procedures to report a release, and limitations on cell phone use during a release. ALJ Initial Decision at 54, F.F. No. 281. Accordingly, the ALJ denied Complainants' requests for mass warning systems, addition of odorants to the NGLs in the pipelines, and notice of evacuation procedures, as well as their requests to have Sunoco revise its public mailers to address "what a safe distance is before using a cellular phone, wind direction and other means of transporting persons other than walking away and upwind from a release." ALJ Initial Decision at 140, 161, 167-69. The ALJ concluded that these requests should be addressed in the Commission's on-going rulemaking proceeding that was considering amendments to the public awareness regulations.

On the other hand, the ALJ found inadequacies in Sunoco's public awareness program. William H. Turner, Deputy Director for Chester County's Department of Emergency Services, testified that Sunoco's CoRE meetings and MERO trainings were insufficient for planning purposes. Turner testified that trying to get information from Sunoco for the County's emergency response plan was like hitting a "brick wall." ALJ Initial Decision at 147. Should a leak occur in the pipeline valve located near the Downingtown Area School District, Turner estimated that it would take 10 minutes for the pipeline operator to arrive on the scene with a gas meter. Turner believed that Sunoco should enhance its public outreach and education programs by providing municipalities and school districts information needed to develop their emergency response plans. *Id*. at 148-49.

In these findings, the ALJ credited the testimony of Timothy Hubbard, the fire marshal and emergency management officer in Charlestown Township, Chester County. Hubbard explained it was difficult to have "consistent contact" with Sunoco on information such as "what product is flowing at any given time, when it's flowing, when products are changing and the nature of the products." ALJ Initial Decision at 148. Hubbard testified there was a lack of "real, true and credible

13

assistance" from Sunoco, such as "expert advice from the perspective of a pipeline operator or resources in the event that an emergency were to occur." *Id*. Hubbard does not know, for example, how much product would be released in a leak before the shut-off valves can be activated.

The ALJ found emergency planning agencies, first responders, residents, school districts, and municipalities were "confused and concerned" about how to protect their communities in the event of a gas leak. ALJ Initial Decision at 149. School officials did not know whether cellphones can be safely used in an evacuation that could involve thousands of children. Witnesses from multiple school districts expressed confusion over the first steps to take in a pipeline emergency. West Chester and Twin Valley School Districts planned to have students shelter in place until receiving further notice, but this contravened Sunoco's recommendation to evacuate from the scene of a pipeline emergency, on foot, immediately. Hubbard, who also serves as the chief security officer of the Downingtown Area School District, questioned Sunoco's recommendation to evacuate on foot and upwind. The Downingtown Area School District has a student population that ranges in age from kindergarten through twelfth grade, and it includes special needs children. Deciding wind direction is a "hit-or-miss" situation, particularly since winds fluctuate. *Id*. at 154. If a leak occurred near the playground, it could asphyxiate children. Should a car drive through a leak, it could ignite an explosion. Emile Lonardi, the superintendent of Downingtown Area School District testified that she "has been given conflicting information" and did not have a "credible or practical or realistic plan in place to keep the students safe in the event of leak" from the Mariner East pipelines. *Id*. at 153.

The ALJ found a "need for emergency response measures by [Sunoco] that will maximize the timeliness and effectiveness of the school districts' response at each of their facilities." ALJ Initial Decision at 156. The ALJ found Sunoco's

existing CoRE exercises and MERO training on accidents to be inadequate. Accordingly, the ALJ concluded Sunoco's failure to engage with the local emergency personnel upon their request constituted "unreasonable service," in violation of 66 Pa. C.S. §1501 and 52 Pa. Code §59.33. ALJ Initial Decision at 151. Sunoco's failure to provide sufficient guidance to schools located within a few hundred feet of the Mariner East pipelines specifically violated 49 C.F.R. §195.440(d)(4), which requires Sunoco to reach out to "appropriate government organizations" with "steps that should be taken" in the event of an emergency. ALJ Initial Decision at 151. The ALJ was persuaded that school districts should receive the same information provided to emergency responders in light of their responsibility to plan for emergencies.

The ALJ also found deficiencies in Sunoco's required communication with the public. The federal regulation at 49 C.F.R. §195.440(a) requires that a pipeline operator develop and implement a written continuing public education program that follows the guidance provided by API Recommended Practice (RP) 1162. In turn, Section 4.2 of API RP 1162 provides that "operators should provide *a very broad overview of potential hazards*, their potential consequences and the measures undertaken by the operator to prevent or mitigate the risks from the pipelines." R.R 1146a (emphasis added).[9]

---

[9] API RECOMMENDED PRACTICE 1162 (First Edition, December 2003), *Public Awareness Programs for Pipeline Operators*, at 19. Section 4.2 of API RP 1162 states:

*Hazard Awareness and Prevention Measures*

Operators should provide a very broad overview of potential hazards, their potential consequences and the measures undertaken by the operator to prevent or mitigate the risks from pipelines (including, at the operator's discretion, an overview of the industry's safety record). Additionally, operators should provide an overview of their preventative measures to help assure safety and prevent incidents. The scope of the hazard awareness and prevention message should be more detailed for the emergency responder audience than for other audiences, and should include how to obtain more specific information upon request from the operator.

R.R. 1146a.

Based on these findings of fact and conclusions of law, the ALJ recommended the imposition of a civil penalty of $2,000 on Sunoco for "having violated regulations: 49 C.F.R. §195.440; 49 C.F.R. §195.210; [49 C.F.R. §]195.248; 66 Pa. C.S. §3301(c); 49 U.S.C.A. §60118(a); 52 Pa. Code §69.1201; 66 Pa. C.S. §1501 and 52 Pa. Code §59.33." ALJ Initial Decision at 197; Conclusion of Law No. 71. Of the $2,000 civil penalty, $1,000 was imposed for Sunoco's "unreasonable service [] to not oblige [the school districts and municipalities'] request" for "more information and emergency responder training." ALJ Initial Decision at 140. The remaining $1,000 penalty, accordingly, was for the violation of the pipeline depth of cover and distancing regulations. The ALJ also recommended injunctive-type relief to address these violations.

**Commission Adjudication**

Sunoco filed exceptions to the ALJ's Initial Decision. It challenged the ALJ's determination that it had violated the pipeline depth of cover and distance regulations in 49 C.F.R. §§195.210(b), 195.248, and 195.250, which were not an issue in the proceeding. In addition to violating Sunoco's right to due process, the ALJ misinterpreted the cited federal regulations, which did not apply to the ME1 and the workaround pipelines, and made findings of fact unsupported by substantial evidence. Sunoco objected to the ALJ's order to revise its public awareness program because it imposed a burden not required under Pennsylvania or federal law or imposed on any other pipeline operator.

By adjudication of November 18, 2021, the Commission denied Sunoco's exceptions. The Commission adopted the ALJ's proposed findings of fact, conclusions of law and recommended order as its own. The Commission imposed a civil penalty in the total amount of $2,000.

With regard to Sunoco's public awareness program, the Commission also ordered remediation measures. They included the following:

16

18. That Sunoco Pipeline, L.P. is directed to contact Chester County Commissioners, Delaware County Commissioners, and all municipalities' supervisors therein within thirty (30) days of the date of Final entry of this Opinion and Order in this consolidated proceeding to arrange for meeting(s) (either remotely or in-person or a combination thereof as mutually agreeable) to:

a) establish emergency contact list information for the operator's controller and county liaison(s);

b) disclose to Middletown Township, Delaware County, and Chester County any damage or potential damage to their respective facilities or properties resulting from the operation of the pipelines;

c) assist with the establishment of emergency plans for first responders in the event of a leak, release, explosion, or other failure of the pipeline system and the communication of all information required under state and federal law to enable Middletown, Delaware County, and Chester County to prepare such emergency plans;

d) inform and educate Middletown and Delaware County officials and staff on proper and effective disaster prevention and disaster response, including participation in "tabletop" activities and/or "boots on ground" exercises as referenced by Sunoco in its letter dated August 13, 2020 and admitted as exhibit SUNOCO-50 and as requested by Complainants and their aligned Intervenors;

e) develop standard notification templates for public warning systems to be used during a pipeline emergency and develop emergency classification levels (i.e., a small leak release versus a rupture event) which are specifically designed to make the public aware of the situation;

f) provide detailed information regarding its infrastructure;

g) assist in the development of an evacuation plan for use by municipalities with concept of how evacuation would occur;

h) create a public outreach and public education program;

i) introduce to the operator's designated County liaison(s) a tour of the area surrounding the pipeline facilities such that the liaison(s) may be made aware of the geology, terrain and location of schools, libraries, retirement and apartment housing as well as train tracks, roadways, recreational parks, housing developments such that the liaison may provide local emergency planning assistance to local emergency management partners that could consist of dedicated employee(s) and or funding to support additional employees;

j) notify not only the County but all municipalities in Delaware or Chester County of anticipated, scheduled or commenced work done in those counties;

k) notify County officials, in advance, of any pipeline activity, such as simulations, testing, routine maintenance, repairs, etc.;

l) subject to a nondisclosure agreement, share with Chester County's Department of Emergency Services maps of all transmission lines listing material moved, pipeline diameter, mainline valve locations and maximum operating pressures (MOP), and maximum allowable operating pressure (MAOP) and information about the location of any anomalies that merit pressure reduction in the pipeline and the presence of "immediate," "60-day" or "180-day" repair conditions for liquid pipelines or "immediate" or "one- year" repair conditions for gas pipelines; and

m) establish times and dates for follow-up meetings and periodic meeting schedules as mutually agreeable between municipalities, counties and Sunoco Pipeline, L.P.

Commission Adjudication at 113-15.

As to depth of cover over, and distance between, Sunoco's pipelines, the Commission ordered remediation measures that follow:

24. That Sunoco Pipeline, L.P. is directed to conduct a depth of cover and distance between other underground pipelines/structures survey regarding Mariner East 1 and the 12-inch workaround pipelines as long as they are purposed for carrying highly volatile liquids a/k/a natural gas liquids.

25. That Sunoco Pipeline, L.P. is directed to bury its Mariner East 1 and 12-inch pipelines as long as these pipelines are transporting Highly Volatile Liquids such that they are at least twelve inches apart from other underground pipes or structures unless the operator can show it is providing adequate corrosion control in these areas where the pipes are less than twelve inches apart.

26. That within one hundred twenty (120) days of the date of Final entry of this Opinion and Order, Sunoco Pipeline, L.P. shall file a report with the Commission certifying whether Mariner East 1 and the 12-inch workaround pipelines that are transporting highly volatile liquids within Chester and Delaware Counties are buried so that they are below the level of cultivation and so the cover between top of pipe and ground level, road bed, river bottom or underwater natural bottom is in compliance with minimum regulatory requirements and the distance between pipeline exteriors and the exteriors of other underground pipelines/utility structures are at least twelve inches apart unless adequate corrosive control action can be shown, and that a copy of the report be served upon the Commission's Bureau of Technical Utility Services and the Bureau of Investigation and Enforcement.

27. That the report as described in Ordering Paragraph No. 26 shall contain a corrective action plan regarding any areas of operating pipelines (including Mariner East 1, 8-inch pipeline, and the 12-inch workaround pipelines) carrying highly volatile liquids in Delaware and Chester Counties in need of remediation where there is lack of required cover and/or proper distance between other structures/pipelines in order to bring these pipelines up to federal minimum codified requirements.

> 28. That the report as described in Ordering Paragraph No. 26 shall be filed annually for a period of three (3) years.

Commission Adjudication at 116-17.

Sunoco appealed to this Court. On November 18, 2022, the Commission filed a motion to dismiss Sunoco's petition for review, in part, on grounds of mootness.

## Appeal

On appeal,[10] Sunoco raises two issues for our review. First, Sunoco argues that the Commission erred in holding that it violated the federal regulations on depth of cover and distance between pipelines. This issue was not raised in any of the formal complaints and, thus, Sunoco was deprived of notice and an opportunity to be heard. Alternatively, Sunoco argues that the Commission misconstrued and misapplied the federal regulations because they govern the construction of new pipelines built after 1981, when the federal regulations on depth of cover and pipeline distance were promulgated. The ME1 and the workaround pipelines are exempt because they were constructed in the 1930s. Further, other federal regulations govern the operation and maintenance of existing gas pipelines. In any case, the ALJ's findings of fact on depth of cover and spacing of the ME1 and the workaround pipelines are not supported by substantial evidence. Second,

---

[10] On a petition to review an adjudication of the Commission, our standard of review is limited to determining whether substantial evidence supports the necessary findings of fact, whether the Commission erred as a matter of law, and whether constitutional rights were violated. *Retail Energy Supply Association v. Pennsylvania Public Utility Commission*, 185 A.3d 1206, 1220 (Pa. Cmwlth. 2018) (quotations omitted). We defer to the Commission's interpretation of the Public Utility Code and its own regulations unless the Commission's interpretations are clearly erroneous. *Id*. (quotations omitted). We may not substitute our judgment for that of the Commission "when substantial evidence supports the [Commission's] decision on a matter within the [C]ommission's expertise." *Id*. (quotations omitted). "Judicial deference is even more necessary when the statutory scheme is technically complex." *Id*. (quotations omitted). On issues of law, "our standard of review is *de novo* and our scope of review is plenary." *Id*.

Sunoco argues that the Commission erred and abused its discretion in ordering Sunoco to revise its public awareness program in ways not required by existing state and federal regulations. Effectively, the Commission's order to Sunoco constitutes the promulgation of a regulation that cannot be done in the course of an adjudication but only in a rule-making proceeding.

In its motion to dismiss, the Commission argues that Sunoco's appeal of its adjudication with respect to the depth of cover and distance of the ME1 and 12-inch workaround pipelines is moot because those pipelines are no longer transporting HVLs. On the merits, the Commission argues that it acted within its authority under the Public Utility Code and the applicable regulations to ensure that Sunoco provided adequate, safe, and reasonable service. Further, it argues that the Commission's interpretation of the Public Utility Code and applicable regulations, including the federal regulations, is entitled to deference.[11]

## Mootness

We begin with the Commission's motion to dismiss Sunoco's appeal for mootness. The Commission asserts that Sunoco's appeal on the Commission's adjudication regarding "depth of cover and pipeline distance *applied directly and exclusively to Sunoco's* [*ME1*] *and 12-inch workaround pipelines as long as these*

---

[11] The Commission regulations at 52 Pa. Code §59.33, promulgated pursuant to 66 Pa. C.S. §1501, require that hazardous liquid utilities shall have minimum safety standards consistent with the pipeline safety laws at 49 U.S.C. §§60101-60503 and the regulations at 49 C.F.R. Parts §§191-193, 195, and 199. The Commission regulations adopt federal safety standards for hazardous liquid facilities. These standards include what materials must be used for new hazardous liquid pipelines, and how those pipelines should be constructed, as well as corrosion control, maintenance and testing of existing hazardous liquid pipelines. The standards also address emergency preparedness and public awareness plans.

*pipelines are transporting* [*HVLs*]" is now moot. Commission Motion, ¶5 (emphasis in original). The ME1 and the 12-inch workaround pipelines are no longer transporting HVLs. Sunoco responds that because the adjudication ordered a civil penalty for violating the depth of cover and distance regulations, its appeal cannot be moot. If Sunoco succeeds in its appeal, it can recover its payment. Further, an adjudicated violation will be used to establish a penalty in a future enforcement action against Sunoco, should one occur. *See* 52 Pa. Code §69.1201(c)(6) (providing that frequent, recurrent violations by a public utility may result in a higher penalty).

Generally, a case will be dismissed as moot if there exists no actual case or controversy. *Fraternal Order of Police v. City of Philadelphia*, 789 A.2d 858 (Pa. Cmwlth. 2002). The existence of a case or controversy requires

> (1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for a reasoned adjudication, and (3) a legal controversy with sufficiently adverse parties so as to sharpen the issues for judicial resolution.

*Mistich v. Pennsylvania Board of Probation and Parole*, 863 A.2d 116, 119 (Pa. Cmwlth. 1994) (quoting *Dow Chemical Company v. United States Environmental Protection Agency*, 605 F.2d 673, 678 (3rd Cir.1979)). A controversy must continue through all stages of judicial proceedings, trial and appellate, and the parties must continue to have a "personal stake in the outcome" of the lawsuit. *Mistich*, 863 A.2d at 119 (quoting *Lewis v. Continental Bank Corporation*, 494 U.S. 472, 477–78 (1990)).

An exception to mootness will be found where (1) the conduct complained of is capable of repetition yet likely to evade judicial review; (2) the case involves issues of great public importance; or (3) one party will suffer a detriment in the absence of a court determination. *Horsehead Resource Development Company, Inc. v. Department of Environmental Protection*, 780 A.2d 856, 858 (Pa.

22

Cmwlth. 2001). It is within the court's discretion to decide "substantial questions, otherwise moot, which are capable of repetition unless settled." *Colonial Gardens Nursing Homes, Inc. v. Bachman*, 373 A.2d 748, 750 (Pa. 1977).

Sunoco's decision to discontinue using the ME1 and the 12-inch workaround pipelines for HVLs does not moot its challenge to the adjudicated violation of the depth of cover and distance regulations because Sunoco has paid a $1,000 civil penalty for that violation and would like it refunded. Additionally, nothing in the Commission's order prevents Sunoco from resuming the transportation of HVLs in the ME1 and the 12-inch workaround pipelines at some point in the future.

Accordingly, we deny the Commission's motion. We turn, then, to the merits of Sunoco's issues on appeal.

### Depth of Cover and Distance Pipeline Regulation

Sunoco argues that it was denied due process because the pipeline depth of cover and distance regulations found in 49 C.F.R. §§195.210, 195.248 or 195.250 were not cited in any of the formal complaints. The Flynn complaint originally cited the federal depth of cover regulation, but not the distance regulation. However, the Flynn Complainants withdrew that complaint and did not include that issue in their amended complaint. None of the other formal complaints cited these federal regulations, and none of the Complainants or Aligned Intervenors raised these federal regulations in their post-hearing briefs. Sunoco argues that the ALJ erred in raising, *sua sponte*, the depth of cover and distance regulations for the first time in her Initial Decision.

The Commission responds that the Flynn complaint alleged a violation of 66 Pa. C.S. §1501, and the pipeline safety regulation at 52 Pa. Code §59.33. This put Sunoco on notice that compliance with all state and federal pipeline safety regulations would be at issue, even without a specific citation to 49 C.F.R.

23

§§195.210, 195.248 or 195.250.  Further, the ALJ's pre-hearing order stated that one of the issues to be addressed was "the safety and integrity of ME1, ME2, ME2X, and the 12-inch pipelines" and "the safety of the locations of the pipelines[.]" Commission Brief at 53 (quoting R.R. 844a-46a).

It is beyond peradventure that an administrative hearing is limited to the legal questions raised by the parties.  The hearing tribunal may not, *sua sponte*, augment the subject matter of a proceeding.  As this Court has recently explained:

> *Sua sponte* consideration of an issue deprives counsel of the opportunity to brief and argue the issues and the court of the benefit of counsel's advocacy. Moreover, raising issues *sua sponte* after the record is closed and without notice to the parties constitutes a due process violation.

*Orange Stones Company v. Borough of Hamburg Zoning Hearing Board*, 991 A.2d 996, 999 (Pa. Cmwlth. 2010) (quotations omitted).

On due process, this Court has directed that a utility must be "afforded a reasonable opportunity to know the nature of its opponents' contentions so that it can prepare a suitably responsive answer."  *Duquesne Light Company v. Pennsylvania Public Utility Commission*, 507 A.2d 433, 437 (Pa. Cmwlth. 1986). *See also Commonwealth v. Public Utility Commission*, 331 A.2d 598, 600 (Pa. Cmwlth. 1975) ("anyone involved in a proceeding" is entitled to "notice of specific charges or complaints").  In *Duquesne Light Company*, the Commission ordered an electric utility to refund customers the cost of replacement service required by the utility's shutdown of a nuclear plant.  The utility challenged the Commission's order on grounds that it did not receive adequate notice that the reasonableness of its actions immediately preceding the shutdown order was a matter in issue.  This Court agreed, holding that the Commission violated due process by deciding an issue for which the utility did not receive notice.

In *Pocono Water Company v. Pennsylvania Public Utility Commission*, 630 A.2d 971 (Pa. Cmwlth. 1993), a formal complaint alleged inadequate service from a water utility. *Sua sponte*, the ALJ imposed a penalty upon the water company because it had not complied with a prior order of the Commission to build storage tanks. In its appeal, the utility asserted a violation of due process because there was no notice that a prior order was at issue. Reversing the Commission's order, this Court explained as follows:

> Due process in matters before the Commission requires that a party be afforded reasonable notice of the nature of the allegations against it so that the party can prepare a suitable defense. *Duquesne Light Co. v. Pennsylvania Public Utility Commission*, 507 A.2d 433. Although the Commission may take notice of results it reached in other cases, the record must reflect that the parties had notice that the Commission would consider such evidence. *City of Erie v. Pennsylvania Public Utility Commission*, [] 398 A.2d 1084 ([Pa. Cmwlth.] 1979). This Court has held that the Commission violated due process rights when it assessed liability by determining an issue which the utility had not been afforded a reasonable opportunity to address at an evidentiary hearing.

*Pocono Water Company*, 630 A.2d at 973.

Here, the depth of cover regulation was expressly withdrawn from the Flynn complaint, and the pipeline separation issue was never raised. Rather, the formal complaints raised general safety concerns about the Mariner East pipeline system. Ironically, the ALJ did not make a specific finding that the system was unsafe. More to the point, a general allegation about "safety" did not put Sunoco on notice that it should prepare to defend the spacing and depth of its pipelines, which are very specific in their terms.[12] Further, Complainants and their Aligned

---

[12] By contrast, the formal complaints put Sunoco on notice that it should prepare to defend its public awareness program. *See* Flynn Complaint ¶¶115-122; R.R. 174a-75a (Sunoco failed to provide an adequate public awareness program under 49 C.F.R. §195.440); DiBernardino Complaint ¶¶22-32; R.R. 266a-68a (Sunoco failed to provide an adequate emergency planning and

25

Intervenors made no argument in post-hearing briefs with respect to depth of cover or pipeline distancing. They sought neither injunctive relief nor a civil penalty under 49 C.F.R. §§195.210, 195.248 or 195.250.

We reject the Commission's argument that a general citation to 52 Pa. Code §59.33, which adopted Part 195 of the C.F.R., was sufficient to put Sunoco on notice that it was charged with a violation of the specific requirements of 49 C.F.R. §§195.210, 195.248 or 195.250. As in *Duquesne Light Company* and *Pocono Water Company*, this lack of notice to Sunoco violated due process. Accordingly, we reverse the Commission's holding that Sunoco violated the pipeline depth of cover and distance regulations.[13]

## Public Awareness Program

Sunoco argues, next, that the Commission erred in ordering Sunoco to make changes to its public awareness program that are not set forth in any state or federal law. Further, the Commission's adjudication is inconsistent with the ALJ's findings about Sunoco's public awareness program implemented in Delaware and Chester Counties.

The ALJ found that Sunoco does more training and funds more equipment purchases than any other pipeline operator in the area. ALJ Initial

---

public awareness program under 49 C.F.R. §195.440); Britton Complaint ¶¶5, 11; R.R. 361a, 364a (political subdivisions were not presented with adequate information from Sunoco to adequately prepare and mitigate for the public health and safety under 49 C.F.R. §195.440); Obenski Complaint ¶1; R.R. 635a-37a (Sunoco's public awareness program failed to appropriately educate all members of the community who are at risk from the operation of the Mariner East network); and Andover Complaint ¶¶87, 93, 97, 98; R.R. 747a-49a (Sunoco's public awareness program leaves association members without either a credible notification system or emergency plan).

[13] Because we reverse the Commission's adjudication insofar that Sunoco violated the federal pipeline depth of cover and distance regulations, we need not address Sunoco's arguments that the Commission misinterpreted these federal depth of cover and distance regulations because they apply only to the construction of new pipelines, not to the maintenance or operation of an existing pipeline. Likewise, we need not address Sunoco's argument that, in any case, the findings of fact relevant to a purported violation are not supported by substantial evidence.

Decision at 59, F.F. No. 320. The ALJ also found that Sunoco has informed the municipalities and school districts in Delaware and Chester Counties of the location of its pipelines and valve stations and their proximity to schools; the products in the pipelines and their physical properties; the hazards of those products; a rule of thumb for a safe distance in the event of a significant release; the direction of flow of product in the pipelines; the product between the corresponding valve sites that will be released in the event of a catastrophic release; plume modeling; Sunoco's integrity management, security and PHMSA compliance programs; and Sunoco's remote monitoring center for leak detection. ALJ Initial Decision at 60, F.F. No. 324.

These findings demonstrate Sunoco's compliance with the minimum requirements for its public awareness program set forth in 49 C.F.R. §195.440 and API RP 1162. Nevertheless, the Commission concluded that Sunoco's public awareness program did not meet the requirement of "reasonable service" under 66 Pa. C.S. §1501 and, thus, imposed more requirements listed in Paragraph No. 18 of its order. The Commission did so without citing any "authority mandating these meetings or requiring Sunoco [] to undertake all the various elements of Order ¶18." Sunoco Brief at 59.

Sunoco argues that the Commission's "reasonable service" expectations are not grounded in an existing state or federal law. The ALJ acknowledged in the Initial Decision that the Commission has undertaken rulemaking in this area and is seeking comments regarding: (1) utility interaction with local government officials on such topics as emergency planning and response coordination and periodic drills with utility/municipal coordination; (2) periodic public awareness meetings with municipal officials and the public; and (3) enhancements to public utility public awareness programs under 49 C.F.R. §195.440 and API RP 1162. ALJ Initial Decision at 77. Sunoco argues that the Commission

27

has imposed these proposed rulemaking requirements on Sunoco, in advance of their adoption.

The Commission responds that as a public utility, Sunoco must provide safe and reasonable service, which includes the obligation to "use every reasonable effort to properly warn and protect the public from danger." 52 Pa. Code §59.33(a). The federal regulation at 49 C.F.R. §195.440 specifically requires enhanced communication with local public officials where the pipeline is located in a high consequence area, which includes Delaware and Chester Counties. The Commission argues that Sunoco failed to meet this obligation.

The Commission asserts the Public Utility Code gives the Commission the discretion to order a utility to take action in the interest of reasonable service without a specific regulation. The Commission may "prescribe, by regulation *or order*," the "repairs, changes, alterations, extensions, substitutions, or improvements in facilities as shall be reasonably necessary and proper for the safety, accommodation, and convenience of the public." 66 Pa. C.S. §1505(a) (emphasis added).[14] That the Commission is concurrently exercising its rulemaking power did not prevent it from prescribing specific measures to address the safety and reasonableness of Sunoco's Mariner East pipeline system under authority of 66 Pa. C.S. §1505(a).

---

[14] It reads:

> (a) General rule.--Whenever the commission, after reasonable notice and hearing, upon its own motion or upon complaint, finds that the service or facilities of any public utility are unreasonable, unsafe, inadequate, insufficient, or unreasonably discriminatory, or otherwise in violation of this part, the commission shall determine and prescribe, by regulation or order, the reasonable, safe, adequate, sufficient, service or facilities to be observed, furnished, enforced, or employed, including all such repairs, changes, alterations, extensions, substitutions, or improvements in facilities as shall be reasonably necessary and proper for the safety, accommodation, and convenience of the public.

66 Pa. C.S. §1505(a).

The Commission contends that its interpretation of the Public Utility Code and its own regulations is entitled to deference. Commission Brief at 34 (citing *Crown Castle NG East LLC v. Pennsylvania Public Utility Commission*, 234 A.3d 665, 678 (Pa. 2020)). The regulation at 49 C.F.R. §195.440 requires the public awareness program to "be as comprehensive as necessary to reach all areas in which the operator transports hazardous liquid[.]" 49 C.F.R. §195.440(f). The Commission asserts that it acted "well within the purpose and intent" of the federal regulations by prescribing reasonable public awareness measures appropriate for the high consequence areas of Chester and Delaware Counties. Commission Brief at 49.

In addition, Section 1501 of the Public Utility Code requires safe and reasonable service. It states:

> *Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities*, *and shall make all such* repairs, *changes,* alterations, substitutions, extensions, and *improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public.* Such service also shall be reasonably continuous and without unreasonable interruptions or delay. Such service and facilities shall be in conformity with the regulations and orders of the commission.

66 Pa. C.S. §1501 (emphasis added). Consistent with Section 1501, the Commission has promulgated 52 Pa. Code §59.33, which has adopted the federal regulations on natural gas safety. It states, in relevant part, as follows:

> (a) Responsibility. Each public utility shall at all times use every reasonable effort to properly warn and protect the public from danger, and shall exercise reasonable care to reduce the hazards to which employees, customers and others may be subjected to by reason of its equipment and facilities.
>
> (b) Safety code. The minimum safety standards for all natural gas and hazardous liquid public utilities in this Commonwealth shall

29

be those issued under the pipeline safety laws as found in 49 U.S.C.A. §§60101-60503 and as implemented at 49 CFR Parts 191-193, 195 and 199, including all subsequent amendments thereto. Future Federal amendments to 49 CFR Parts 191-193, 195 and 199, as amended or modified by the Federal government, shall have the effect of amending or modifying the Commission's regulations with regard to the minimum safety standards for all natural gas and hazardous liquid public utilities.

52 Pa. Code §59.33(a), (b).

The federal regulation "prescribes safety standards and reporting requirements for pipeline facilities used in the transportation of hazardous liquids[.]" 49 C.F.R. §195.0. With respect to "public awareness," it states:

(a) *Each pipeline operator must develop and implement a written continuing public education program that follows the guidance provided in the American Petroleum Institute's (API) Recommended Practice (RP) 1162* (incorporated by reference, see §195.3).

(b) *The operator's program must follow the general program recommendations of API RP 1162 and assess the unique attributes and characteristics of the operator's pipeline and facilities.*

(c) *The operator must follow the general program recommendations, including baseline and supplemental requirements of API RP 1162*, unless the operator provides justification in its program or procedural manual as to why compliance with all or certain provisions of the recommended practice is not practicable and not necessary for safety.

(d) *The operator's program must specifically include provisions to educate the public, appropriate government organizations, and persons engaged in excavation related activities on:*

(1) Use of a one-call notification system prior to excavation and other damage prevention activities;

(2) Possible hazards associated with unintended releases from a hazardous liquid or carbon dioxide pipeline facility;

(3) Physical indications that such a release may have occurred;

(4) *Steps that should be taken for public safety in the event of a hazardous liquid or carbon dioxide pipeline release; and*

(5) Procedures to report such an event.

(e) The program must include activities to advise affected municipalities, school districts, businesses, and residents of pipeline facility locations.

(f) *The program and the media used must be as comprehensive as necessary to reach all areas in which the operator transports hazardous liquid or carbon dioxide.*

\* \* \* \*

(i) *The operator's program documentation and evaluation results must be available for periodic review by appropriate regulatory agencies.*

49 C.F.R. §195.440 (emphasis added).

In sum, a pipeline operator must follow "the general program recommendations, *including baseline and supplemental requirements of API RP 1162*[.]" 49 C.F.R. §195.440(c) (emphasis added). In turn, API RP 1162 defines, in relevant part, "baseline public awareness program[,]" as

[r]efer[ring] to general program recommendations, set forth in [API RP] 1162[.] *The baseline recommendations do not take into consideration the unique attributes and characteristics of individual pipeline operators' pipeline and facilities. Supplemental or enhanced program components are described in the RP to provide guidelines to the operator for enhancing its Public Awareness Programs.*

R.R. 1129a (emphasis added). Satisfying the "baseline recommendations" does not preclude "enhanced program components." *Id*. Accordingly, API RP 1162 states that a "one-size-fits-all" Public Awareness Program across all pipeline systems would not be the most effective approach. R.R. 1134a.

Relevant hereto, API RP 1162 includes Table 2.1, which sets forth the baseline messages to be included in pipeline operators' public awareness

31

communications.  Table 2.1 then provides that in high consequence areas, or HCA, pipeline operators should increase the frequency of their communications, provide supplemental messages, and have personal contact with the local officials.

Table 2-1 - Summary Public Awareness Communications for Hazardous Liquids and Natural Gas Transmission Pipeline Operators (Continued)

| Stakeholder Audience | Message Type | Delivery Frequency | Delivery Method and/or Media |
|---|---|---|---|
| **2-1.2 Emergency Officials** | | | |
| Emergency Officials | **Baseline Messages:**<br>• Pipeline purpose and reliability<br>• Awareness of hazards and prevention measures undertaken<br>• Emergency Preparedness Communications<br>• Potential hazards<br>• Pipeline location information and availability of NPMS<br>• How to get additional information | **Baseline Frequency =** Annual | **Baseline Activity:**<br>• Personal contact (generally preferred)<br>OR<br>• Targeted distribution of print materials<br>OR<br>• Group meetings<br>OR<br>• Telephone calls with targeted distribution of print materials |
| | **Supplemental Message:**<br>• Provide information and /or overview of Integrity measures undertaken<br>• Maintenance construction activity | **Supplemental Frequency:** Additional frequency and supplemental efforts as determined by specifics of the pipeline segment or environment | **Supplemental Activity:**<br>• Emergency tabletop, deployment exercises<br>• Facility tour<br>• Open house |
| **2-1.3 Local Public Officials** | | | |
| Public Officials | **Baseline Messages:**<br>• Pipeline purpose and reliability<br>• Awareness of hazards and prevention measures undertaken<br>• Emergency preparedness communications<br>• One-call requirements<br>• Pipeline location information and availability of NPMS<br>• How to get additional information | **Baseline Frequency** = 3 years | **Baseline Activity:**<br>• Targeted distribution of print materials |
| | **Supplemental Message:**<br>• If applicable, provide information about designation of HCA (or other factors unique to segment) and summary of integrity measures undertaken<br>• ROW encroachment prevention<br>• Maintenance construction activity | **Supplemental Frequency:**<br>• If in HCA, then annual contact to appropriate public safety officials<br>• Otherwise, as appropriate to level of activity or upon request | **Supplemental Activity:**<br>• Personal contact<br>• Telephone calls<br>• Videos and CDs |

R.R. 1138a.[15]

Complainants had the burden to prove that Sunoco's public awareness program did not satisfy 66 Pa. C.S. §1501, which requires a utility to provide safe

---

[15] NPMS stands for National Pipeline Mapping System.  ROW stands for Pipeline Right-of-Way. R.R. 1130a.

and reasonable service. *Povacz v. Pennsylvania Public Utility Commission*, 280 A.3d 975, 1005 (Pa. 2022) (citing *Lansberry v. Pennsylvania Public Utility Commission*, 578 A.2d 600, 602 (Pa. Cmwlth. 1990)). Complainants presented evidence that Sunoco's CoRE meetings and MERO trainings did not provide the information needed by local officials to develop their emergency response plans; that Sunoco refused to meet with local public officials and emergency responders outside the CoRE meetings and MERO trainings; that emergency responders, school districts, and residents are confused and concerned over steps to be taken in a pipeline emergency; and that local public officials found it difficult to obtain additional information from Sunoco needed for emergency preparedness. The ALJ found that because Delaware and Chester Counties have been designated high consequence areas, Sunoco was "required to devote additional focus, effort and analysis to ensure the integrity of its pipelines." ALJ Initial Decision at 140. Accordingly, "if the school districts and municipalities and counties want more information and emergency responder training, then it is unreasonable service for the operator to not oblige this request." *Id.*

The Commission agreed. Accordingly, the Commission ordered the payment of a $1,000 civil penalty and directed Sunoco to arrange meetings with the commissioners of Delaware and Chester Counties and with the relevant municipalities' supervisors to assist their emergency preparedness and evacuation plans. Sunoco argues that this order exceeded the Commission's statutory authority. Sunoco Brief at 58-59 (citing Commission Adjudication, 11/18/2021, ¶18). We are not persuaded.

Section 1505 of the Public Utility Code authorizes the Commission to prescribe remedial action upon a violation of Section 1501 "as shall be reasonably necessary and proper for the safety, accommodation, and convenience of the public." 66 Pa. C.S. §1505. The language in both 49 C.F.R. §195.440 and API RP 1162

provides that a public awareness program must be adapted to meet the particular circumstances and conditions present. The regulation specifically permits "appropriate regulatory agencies" to review operators' program documentation and evaluation results. 49 C.F.R. §195.440(i). More specifically, Section 2.8 of API RP 1162, Table 2.1, provides that operators, in their communications with emergency officials and local public officials, should address, *inter alia*, "pipeline purpose and reliability," "awareness of hazards and prevention measures undertaken," "emergency preparedness communications," and "how to get additional information." R.R. 1138a. Where a pipeline is located in a high consequence area, operators should have "personal contact" with local public officials and provide supplemental messages including "[m]aintenance construction activity." *Id.* Supplemental activity for communications with emergency officials should include "emergency tabletop, deployment exercises," "facility tour," and "open house." *Id.*

We conclude that the remedial actions ordered by the Commission with respect to Sunoco's public awareness program fall within the scope of 49 C.F.R. §195.440 and API RP 1162, which were adopted by the Commission at 52 Pa. Code §59.33. These regulations authorized the Commission to order revisions in Sunoco's existing program to ensure the delivery of safe and reasonable service.

Notably, in adopting the ALJ's Initial Decision, the Commission denied Complainants' requests to include information in Sunoco's public mailers such as "what a safe distance is before using a cellular phone, wind direction and other means of transporting persons other than walking away and upwind from a release." ALJ Initial Decision at 140. These requests, as the ALJ concluded, are outside the scope of state and federal law and, thus, should be referred to the Commission's rulemaking proceeding. The Commission's injunctive relief was narrowly tailored to address the ways in which Sunoco's public awareness program, as implemented,

34

has not satisfied Section 1501 of the Public Utility Code and Section 59.33 of the Commission regulations.

For these reasons, we affirm the Commission's adjudication that Sunoco's public awareness program did not comply with 66 Pa. C.S. §1501 and 52 Pa. Code §59.33, and a civil penalty of $1,000.

## Conclusion

Sunoco's decision to discontinue transporting HVLs through ME1 and the workaround pipelines did not render irrelevant the constraints imposed by the Commission on Sunoco, which may decide to use the pipelines to transport HVLs in the future. Accordingly, we deny the Commission's motion to dismiss. We hold that Sunoco's purported violation of the pipeline depth of cover and distance regulations set forth in 49 C.F.R. §§195.210(b), 195.248, and 195.250 was not a matter at issue in the litigation before the Commission, and, thus, reverse the Commission's adjudication thereon. However, we hold that the Commission did not err in concluding that Sunoco's public awareness program failed to meet the reasonable service standard required by 66 Pa. C.S. §1501. Accordingly, we affirm the Commission's adjudication requiring changes to Sunoco's public awareness program and the payment of a $1,000 civil penalty.

For these reasons, we affirm in part and reverse in part the Commission's adjudication.

_____
MARY HANNAH LEAVITT, President Judge Emerita

Judge Fizzano Cannon and Judge Wallace did not participate in the decision in this case.

35

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Sunoco Pipeline, L.P., | : | **CASES CONSOLIDATED** |
| Petitioner | : | |
| | : | |
| v. | : | Nos. 1415-1419 C.D. 2021 |
| | : | No. 1421 C.D. 2021 |
| Public Utility Commission, | : | |
| Respondent | : | |

# **O R D E R**

AND NOW, this 5th day of May, 2023, the Public Utility Commission's motion to dismiss for mootness is DENIED. The Public Utility Commission's adjudication and order dated November 18, 2021, in the above-captioned matter, is AFFIRMED in part and REVERSED in part in accordance with the foregoing opinion.

_____
MARY HANNAH LEAVITT, President Judge Emerita